## AMOS ATKINSON V. THE STATE.

A charge of the Court, even where it is constructed abstractly, upon general principles of law, may be good cause for reversal in one case and not in another, accordingly as it is or is not calculated to mislead upon application to the facts of the case.

The words "premeditated and deliberate" prefixed by the statute of 1848 to homicide which should constitute murder in the first degree, imply that the killing is designed before the act, and that such design is not the sudden, rash conception of an enraged mind, but that the mind is sufficiently cool and self-possessed to consider of and contemplate the nature of the act then about to be done.

If the jury were fully satisfied, under the penal law of 1848, that the killing was designed before the act, and that such design was not the sudden, rash conception of an enraged mind, but that the mind was sufficiently cool and self-possessed to consider of and contemplate the nature of the act then about to be done, and that the design to take life was fully formed and settled upon, before, and continuing with fixed purpose at, the time of the killing, the length of time during which such state of mind has existed, is not material, provocation is immaterial, and conjoined anger and passion are immaterial: it is murder in the first degree.

If, however, on the other hand, the jury should believe this not to be the state of mind of the slayer, at the time of the killing, but that in and from a transport of passion, (*furor brevis*,) the intention to kill was formed and executed, although the provocation producing such state of mind, was not sufficient in law to extenuate the killing to manslaughter, it would be only murder in the second degree, under the penal law of 1848.

See this case for what is said respecting the cases of Jordan v. The State, 10 Tex. R. 492, and Jones v. The State, 13 Id. 186.

Appeal from Washington. Tried below before the Hon. R. E. B. Baylor.

Indictment for the murder of Thomas Harrison, in December, 1855, tried at the Spring Term, 1856. The evidence is stated in the Opinion. The Court gave all the instructions asked by either party, except the following clause, which was struck out of the seventh instruction asked by the prisoner's counsel : "It is safer to err in acquitting than in punishing; on the part of mercy, than on the part of justice." The only part of the in-

structions given in behalf of the State, that had reference to the distinction between murder in the first, and murder in the second degree, was as follows :—

The above is the legal definition of murder in general ; our statute, however, divides murder into two classes or degrees, and reads as follows : "That all murder committed by poison, starving, torture or other premeditated and deliberate killing, or committed in the perpetration, or in the attempt at the perpetration of arson, rape, robbery, or burglary, is murder in the first degree; and all murder not of the first degree is of the second degree."

If a murder be committed by poison, starving or torture, it is murder in the first degree, without further proof of malice, or that the death of the party was the object sought by the will, deliberation and premeditation of the party killing.

But the words "other premeditated and deliberate killing" need some explanation.

A killing showing such premeditation and deliberation, is equally murder in the first degree; but proof is necessary to show that such killing was the ultimate result which the will, deliberation and premeditation of the party accused sought. The intention of the accused determines the degree of the offence.

If the homicide is premeditated; if there is a specific intention to take life, and life is actually taken, it is murder in the first degree ; if there is not a specific intention to take life, it is murder in the second degree.

If a mortal blow is malicious and death ensue, the perpetrator is guilty of murder, whether it be intended to kill or not ; he is responsible for the effects of such wilful and malicious blow, although he did not intend to kill ; but in such case, he is only guilty of murder in the second degree. But if such blow be intended to kill, he is guilty of murder in the first degree. It is not, however, necessary to show a previous intention and premeditation to take life, unconnected with, or preparatory to, the commission of the act producing death. Such premeditation and intention may be gathered from the nature of the act itself. Whenever such act, unexplained, shows deliberation, as when a man without any cause deliberately shoots another, or by any other act producing death without cause.

If the design to take life be but the conception of a moment, it is as deliberate, so far as judicial examination is concerned, as if it were the plan of years ; or, if the party killing had time to

think, and did intend to kill, for a minute, as well as for an hour or a day, it is a deliberate, wilful and premeditated killing, constituting murder in the first degree.

The prisoner's counsel asked no instruction in respect to the distinction between murder in the first, and murder in the second degree; after the instructions already given, it would have been futile for him to do so. But the following instruction was asked by him, and given by the Court; from which it may be inferred that it was a known fact at the trial, that the instruction from which the above extract is taken, was read from the report of the case referred to:—

The case of Jordan against the State was one in which there was no quarrel, no hot blood, no sudden assault, and no assault at all; and the doctrine there laid down is not applicable to a case of sudden quarrel, upon sufficient provocation and hot blood, where both parties were to blame, and took part in the transactions at the time or immediately preceding the killing.

The Court in giving this instruction, evidently meant, that the doctrine of the case referred to, in relation to the distinction between murder in the first, and murder in the second degree, had no application to the distinction between murder and manslaughter. This is also evident from the following instruction given at the request of the State:—

Words of reproach, however grievous, are not provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions or gestures, expressive of contempt or reproach, without an assault upon the person.

And the following, given at the request of the prisoner:—

Where death ensues in heat of blood, on immediate and sufficient provocation, there having been no previous malice, the offence is manslaughter.

[Since the trial of this case, the law of homicide has been twice changed by statute in this State; first by the Penal Code, enacted in 1856, to take effect the first of January, 1857, by which all homicide, from justifiable to manslaughter, was expressly defined, and all homicide not included in some one of the classes so defined was declared to be murder, the jury having the power to fix the punishment, according to the atrocity of the case, from confinement in the penitentiary for a term of years, to death; and again by amendment of the Penal Code, enacted in 1858, which restores the first and second degrees of murder, but makes them depend on whether the malice is express or implied. The

Atkinson v. The State.

Opinion was delivered in this case on the 4th of January, 1858, at Austin, while the Legislature was in session, a short time before the passage of the amendment to the Penal Code; but we presume that the attention of the Judiciary Committee of neither House was called to it.—REPS.]

*J. E. Shepard,* for appellant. Where death ensues in heat of blood, on immediate provocation, there having been no previous malice, the offence is manslaughter. (Amer. Crim. Law, 374; 4 Black. Com. 191; Amer. Law Hom. 35.)

As to length of time for passion to subside. (Am. Crim. Law, 375; Roscoe's Crim. Ev. 675 and 676, and cases there reported at length.)

Drunkenness may be taken into consideration to lower the grade of crime. (Amer. Crim. Law, 47.)

In defining murder of the first degree, our statute only designates such murder as would be accompanied with the clearest and most express malice, making murder with any other malice of the second degree. (Jones & Jones v. The State, 13 Tex. R. 186.)

Murder in the first degree, under our statute, was what at Common Law was murder with express malice; and murder in the second degree was murder with implied malice. (Id. 187.)

For the best definition of murder with express and with implied malice, see Russel on Crimes, 483.

(Mr. Shepard then proceeded to argue the facts, and the application of the above propositions.)

*Attorney-General,* for appellee. (The Reporters did not find any brief of the Attorney-General with the record in this case.)

ROBERTS, J. The material facts of this case may be comprised in a narrow compass. The prisoner and the deceased were both at the town of Bellville, in the county of Austin, on the 22d day of December, A. D. 1855. They had a violent quarrel during the space of about a quarter of an hour, with but little intermission, which grew out of the prisoner's picking up and walking off with a dollar that was staked between deceased and John C. Cloud, who were playing cards for it. Twice in the time before the killing they had their weapons drawn on each other, the prisoner a pistol and the deceased a hatchet; but both parties,

seeming willing not to carry the matter to an extremity, forbore to use them. The deceased was standing on a gallery, leaning against the post on one side of a door, and resting the hatchet against the other post of the door of the gallery, with his arm extending in a horizontal direction, and the hatchet held downward. The prisoner was standing out a few steps in front of the gallery, and being requested by one of his friends, (a witness,) standing near him, to go off to the blacksmith-shop, where witness' father was, was in the act of starting off, and had gone five or six steps, when the deceased said, "If there are no braver boys on Caney than you are, go home and stay there." The prisoner stepped back, and asked the deceased if he called him a coward, and the deceased answered that he did. The prisoner immediately shot the deceased in the upper part of the face, with the pistol, which killed him; and the prisoner fled.

The deceased had not changed his position in the mean time, until he fell from the shot.

The evidence as to most of the other facts of the case is conflicting, and tending to different conclusions; that of the State tending to show that the killing was deliberate and premeditated, and that in defence tending to show that it was a hasty act, done in a transport of sudden passion.

The State proved by Resom, a witness, that an hour before the difficulty, prisoner, on loading his pistol, and after, with some difficulty, getting down the ball, said "it was good enough to shoot a damned rascal with."

Prisoner proved by two witnesses, who had been attorneys in the case, that Resom was examined twice before in the case, and had made no such statement, and showed that it was not in his written statement.

The State proved, as to the commencement of the difficulty, that, after abusing each other in Ritch's store, prisoner drew his pistol, and said, "If you say that again, I will shoot you," and pointed the pistol at Harrison, the deceased; and that the deceased was taken to the back door by Ritch, and by him advised to leave, and that he there got the hatchet, and returned; and the quarrel recommencing, they were all put out of the house by Ritch.

Prisoner proved, as to the commencement, that deceased followed prisoner into Ritch's store after the money, and when he got to the door he pulled out his knife, opened it, and returned it to his pocket open, and went in and demanded his dollar. At this time

Jack Cloud and Ritch were quarrelling about a breastpin, and deceased took up the quarrel for Ritch, and flourished his knife. Jack Cloud drew his pistol. Deceased went to the back door and picked up a hatchet, and returned with it; in the mean time John C. Cloud was holding Jack Cloud, and the prisoner told deceased, "If you hit him, I will shoot you." One of the witnesses said that at this time the deceased was flourishing a hatchet in one hand and a knife in the other, and that the prisoner said, "If you make your lick, I will shoot you." One of the witnesses said that during this excitement in Ritch's store he heard the deceased say, "Shoot me, if you want to;" and the prisoner said, "I don't want to." One of the witnesses thinks that as they all came out of Ritch's house, the prisoner and the deceased both had their weapons drawn on each other, but did not use them.

A momentary cessation of the difficulty ensued at this point.

The State proved that the deceased started off towards Rosenthall's store, which was twenty-five or thirty steps distant, and stopped at a pile of timber between the two stores, and the prisoner followed him to the timber; the quarrel recommenced, and each party drew their weapons upon the other, but again did not use them.

The prisoner, on the other hand, proved that he left Ritch's store, having put up his pistol, and was walking off towards Rosenthall's; that the deceased started after him, and chopped a round out of a chair in Ritch's gallery as he started, and called to the prisoner, "Stop till I come; I'll show you how it is." Prisoner stopped at the timber near the end of Rosenthall's gallery, and the deceased came up, and the quarrel recommenced; both parties had their weapons drawn. The deceased then had his knife drawn, and his hatchet over the prisoner's head; and deceased said to the prisoner, "God damn you, if you move, I'll stave it into you." Prisoner had his pistol presented. In this position they quarrelled for some time. One of the State's witnesses said that about this time deceased went into Rosenthall's store, and prisoner started and said, "Tom, hav'n't I shown you that I don't want to hurt you?" and cursed very bitterly, and seemed to be very much excited, and stepped to the gallery where Jack Cloud was. Here there was a cessation of a short time, and deceased, being in Rosenthall's store, was whistling and dancing. He came out; the quarrel recommenced; he called prisoner a coward; prisoner said, "If you think I am a coward,

let us shoot at each other five steps, and test the matter; I have done enough to show you that I don't want to hurt you." The deceased said he would do it; (that is, he accepted the challenge.) Rosenthall went up to deceased, took him by the arm, and told him not to do it. (Whereupon Jack Cloud, with a pistol in his hand, pushed Rosenthall back into the house, saying, "Damn you, what is that your business?" Rosenthall "went and got a double-barrel shot-gun, brought it to the door, did not see Jack Cloud, and set it down at the door.") Just then Jack Cloud and the prisoner started off towards the blacksmith-shop, and the deceased spoke the insulting words which caused the prisoner to step back and shoot him, as before stated.

The version of this evidence, favorable to the State, is, that the prisoner having some secret malignity, prepared himself, brought on the quarrel, drew his pistol, and failed to use it only by the bold promptness with which the assault was met; that he followed up the deceased, drew his pistol, and was again deterred from consummating his deadly purpose by the proximity of the deadly weapon in the ready hand of his antagonist; that he still hung round the deceased, and when the provoking language was uttered, which, according to his standard of morals, he thought would give him an excuse, and then being out of danger for the first time when such opportunity had occurred, having by his protestations and seeming forbearance, lulled his victim into fancied security from his violence, based on the idea of his cowardice, he slew his unresisting enemy.

The version of this evidence, in favor of the prisoner, is, that there was no previous enmity; a sudden quarrel originated between them about a trivial matter; that he drew his pistol to prevent his friend, who was being held, from being stricken with the uplifted hatchet; that thereby he attracted upon himself the assault with the same deadly weapon; that he did not shoot the assailant, as then he might have done, but stood upon his defence with his presented pistol; that here, in the first scene of the broil, his voice was heard to announce that he did not want to shoot him; that he left the place, and the deceased started after him, manifesting his reckless violence even upon the inanimate objects within his reach, and called to him to stop; that again the deadly hatchet is held over his head with the threat of being "staved into him if he moves," and again he stays the hand of his assailant with his presented pistol; he could fire, he does not do it; he now appeals to the deceased, that he has done enough to

satisfy him, that he does not want to hurt him; this forbearance to take life, when he could do so, is distorted and misconstrued into cowardice by the deceased; that goaded to bitter curses and high excitement, he offers to test his cowardice by meeting his enemy in fair and equal combat at five steps with pistols, and the deceased, after accepting the challenge, suffers himself to be easily prevented by a friend's intercession; that after all this, at the request of his friend, he is again in the act of walking off; mortified, depressed, the spring of manhood borne down to its last receding point, again are his retreating steps arrested by the taunts of imputed cowardice; all the repressed passions of his nature rebound and burst loose, and declare their supremacy; the result is, his enemy is slain.

The Court below, upon those facts, instructed the jury as to the law, by reading to them the charge, *verbatim*, in the Jordan case, (10 Tex. R. 492–3–4,) and by giving them other charges, as asked by the counsel for the prisoner, on the subjects of manslaughter, self-defence, and reasonable doubts.

The question is, whether or not this charge of the Court, with reference to the facts of this case, was not calculated to mislead the jury. The great jurists of England and America have never been able to devise a charge which would be applicable to every case. Indeed, so vain is the task, it has never been essayed. A charge, which may properly direct the minds of the jury to the true point in one case, may mislead the jury in another, where a different turning point is indicated by the facts of it. It may be erroneous, too, by failing to present the proper distinctions between the different grades of the offence, where the facts, conflicting and leading to different conclusions, require such distinctions to be drawn, so as to enable the jury to determine to which grade the offence belongs. (Mitchell's case, 5 Yerg. 350.) By neglecting this, the jury may as readily be misled, as in any other way. The objection to the charge in this case is, that, considered with reference to the facts of this case, it required the jury to find the prisoner guilty of murder in the first degree, or of manslaughter, (if they believed he was culpable at all,) by too strenuously urging upon the attention of the jury that the test of murder in the first degree was the intention to take the life of the deceased, without sufficient provocation; and by making murder, in the second degree, include only those cases of malicious killing wherein there is no intention to take life. Now if the jury had believed the version of the facts most favorable to the

34

prisoner; that the killing was intended, and was the instantaneous result of high-wrought passion, engendered at the time of the act, but without sufficient provocation, they could not find him guilty of murder in . the second degree under this charge. For the provocation, just at the time of the killing, consisted of provoking words only, and however gross and insulting they may have been, and however great the rage which they induced, they are not recognized by the law as constituting a sufficient provocation to reduce the offence to manslaughter. And that the prisoner did intend to kill, just at the time of firing the pistol, there can be no doubt.

But the jury might have believed from the evidence, that the last insulting words of taunt, under all the circumstances of their utterance by the deceased, were calculated to throw and did throw the prisoner into a transport of passion, under which the intention to kill was then, for the first time, formed, and was instantly executed, by the hasty act of firing the pistol at the deceased.

The question then is, had they come to this conclusion, would it have been murder in the first degree or murder in the second degree.

Our statute, defining the grades of murder, provides that "all murder committed by poison, starving, torture or other premeditated and deliberate killing, or committed in the perpetration, or in the attempt at the perpetration, of arson, rape, robbery or burglary, is murder in the first degree; and all murder not of the first degree is murder of the second degree."

The question arises on the construction of the words " premeditated and deliberate killing." As murder in the first degree is the only grade which is punished capitally, it must be presumed that it was the object of the Legislature to designate the most atrocious species of murder, by the use of the terms " premeditated and deliberate killing." They should receive such construction, if their import, in connection with the subject matter, will permit it, as will accomplish that object. They are not technical words, with a defined meaning by the Common Law. They are familiar words in common use, employed in the statute, not to extend or enlarge the meaning of the words malice aforethought, but to designate a class of offences of darkest shade, included within that term. (Gehrke v. State, 13 Tex. R. 574; Davis v. State, 2 Humph. 43; Wharton, A. C. L. 290; 8 Yerg. 43.)

Atkinson v. The State.

The ordinary meaning of the word "premeditated" is "previously considered, or meditated," and of "deliberate" is, "not sudden or rash," "carefully considering the probable consequences of a step." These words, although prefixed to the act of "killing," necessarily refer to the state of mind of the slayer, at the time of the "killing;" and taken together in their full force, imply, that the killing is designed before the act, and that such design is not the sudden, rash conception of an enraged mind, but that the mind is sufficiently cool and self-possessed to consider of and contemplate the nature of the act then about to be done. It would matter not whether the malice was express or implied, that is shown by antecedent circumstances—or evidenced by the manner or enormity of the act itself—if the jury should believe such a state of mind to exist at the time of the killing, it would be murder in the first degree. When the jury are satisfied that such is fully and clearly the state of the mind, fully formed, and settled upon, before, and continuing with fixed purpose at the time of the killing, the length of time, during which such state of mind has existed, is not material, provocation is immaterial, and conjoined anger and passion are immaterial: it is murder in the first degree.

If, however, on the other hand, the jury should believe this not to be the state of mind of the slayer, at the time of the killing; but that in and from a transport of passion (*furor brevis*) the intention to kill was formed and executed, although the provocation, producing such state of mind, was not sufficient in law to extenuate the killing to manslaughter, it would be only murder in the second degree.

| Tennessee. | Anthony's case, | Meigs, R. 276–7. |
|---|---|---|
| " | Dale's case, | 10 Yerg. R. 552–3–4. |
| " | Dain's case, | 2 Humph. R. 440. |
| " | Swan's case, | 4 Id. 140–1–2. |
| " | Pirtle's case, | 9 Id. 670. |
| " | Mitchell's case, | 5 Yerg. R. 340. |
| " | Same case, | 8 Id. 529. |
| New York. | Sullivan's case, | 1 Parker, Crim. R. 347. |
| Virginia. | Whitford's case, | 6 Randolph's R. 722 & 5. |
| " | Jones' case, | 1 Leigh, 625. |
| Pennsyl'a. | McFall's case, | Addison's R. 257. |
| Indiana. | Finn's case, | 5 Ind. (Porter's) R. 400. |

In Tennessee, where there is a statute very similar to our own, this distinction is made repeatedly, and consistently acted on. (See Anthony's Case and Pirtle's Case, above cited.) In the case of Mitchell v. State, (5 Yerg. 340,) the prisoner, upon a slight provocation of words only, struck the deceased with an axe on the back of the head, and killed him. It directly involved the question in this case, and was reversed and remanded, because the Court below did not instruct the jury as to the distinction between the two grades of murder, so as to enable them to determine whether or not it was murder in the second degree, they having found him guilty of murder in the first degree.

The New York Code, in defining murder, uses the terms "premeditated design." In Sullivan's Case, (1 Parker, 347,) decided as late as 1852 by the Supreme Court of that State, the meaning of these words is ably and elaborately discussed, and the American decisions reviewed, and the whole Court concurred in the opinion, that it was error to charge the jury, that these words meant only, an "intention to kill formed at the instant of striking the blow."

It is believed that the distinction which has been here taken, between the two grades of murder, will accomplish the object, which our Legislature had in view, in making the statute. It is only necessary to make a short review of the rules of construction, variant from this, to show that *they* will not.

1st. It was held in an early case in Pennsylvania, where a similar statute has existed ever since 1794, that the existence of express malice furnished the test of whether or not the offence was murder in the first degree. (Case of Lewis et al., Addison, R. 282–3; Varney's Case, (in Maine) Notes to 1 Hale P. C. 454.)

In the case of Jones & Jones v. The State, (13 Tex. R. 186,) this is spoken of as the test. In that case, however, any such distinction was wholly unnecessary. For the question was whether or not there could be an accessory before the fact, in murder of the second degree; and it was held that as malice was a necessary ingredient in murder of both degrees, there might and could be accessories before the fact in murder of the second degree.

The only advantage of this rule as a test, is one of ease to the Court. The distinctions between malice express and malice implied have existed so long, that the phrases in which they are expressed have become stereotyped and almost technical; and although they may not convey as intelligible ideas to the minds

of jurors as a discursive explanation, couched in common phraseology, they have the probable certainty of being right—for so it is written.

The objections to this rule are: 1st. It may include cases where there is no direct intention to kill. "Malice in fact (express) is a deliberate intention of doing some corporal harm to the person of another." (1 Hale, P. C. 450, and see note 6 for definitions of Hawkins and Blackstone.) 2d. It leaves out a large class of the most aggravated species of murder, where the malice is implied and there is an intention to kill. "When one voluntarily kills another without any provocation." (1 Hale, P. C. 454.) "If a man resolve to kill the next man he meets, and do kill him." (4 Blackstone, Com. 400.)

2d. Mr. Wharton, in his valuable work on American Criminal Law, states the rule to be: "Whenever the deliberate intention is to take life, and death ensues, it is murder in the first degree; whenever it (the intention) is to do bodily harm or other mischief, and death ensues, it is murder in the second degree; while the Common Law definition of manslaughter remains unaltered." (Wharton, A. C. L. 288.) Literally understood, this does not exhaust the subject. Suppose the intention to take life be not deliberate, it is a case not provided for. The mode adopted, however, of defining murder in the second degree, shows what is meant; and that is, that where there is no sufficient provocation, the specific intention to take life is the test, by which murder in the first degree is to be determined.

Most of the leading cases from which he extracts this rule, are quoted from the Pennsylvania Law Journal, which is not now accessible to us. The cases which he has arrayed, in support of this doctrine, when the facts are attentively considered, so far as he has developed them, do not require this restricted test to be applied to them, to make them murder in the first degree; but in all of them there is evidence of premeditation and deliberation (as those terms are understood by us.)

In the Jordan case, (10 Tex. R. 492,) the charge of the Court below followed this rule, as laid down by Mr. Wharton. That charge was revised in the Supreme Court, and being considered with reference to the facts of that case, was sustained—the effort of the Opinion being to show, that it sufficiently directed the attention of the jury to premeditation and deliberation, and that the length of time of their existence before the act was not material. In that case the charge could hardly have misled the

jury. For there was no pretence of a provocation, there was express malice, evidenced by a desperate threat to take life, and the act was done after a whole minute's pause and silent consideration. The Court did not make the distinction of the grades of murder, founded on the act of killing in passion aroused by provocation, though insufficient; nor can we say that the facts of that case required it to be made.

Mr. Wharton, in making a summary of the cases upon which he relies, (page 288,) says: " There are, however, certain features, which, in cases of deliberate homicide, draw forth, generally, from the Courts' instructions to the jury, that by them a deliberate intent to take life is shown." And after enumerating many of those features, he concludes: "Where, in any way, evidence arises which shows a harbored design against the life of another, such evidence goes a great way to fix the grade of homicide at murder in the first degree." The rule, thus modified, is correct as far as it goes. Will it be said that murder at Common Law cannot be committed by a rash, hasty act of passion, which is not deliberate, if the provocation is not sufficient to extenuate it to manslaughter? If it be admitted that such a case be possible (and how can it be doubted?) then it is omitted to be assigned a position in either grade, under his definitions of each of the grades.

The objections to this rule as a test, are: 1st. It restricts the ordinary meaning of the words "premeditated and deliberate" unnecessarily; being words in common use and well understood, and not technical.

2d. It attaches to the lightest shade of the crime of murder—where the killing is in sudden passion, though on not quite sufficient provocation to extenuate, the highest grade of punishment known to the law. It is well known that, practically in such a case, the difference between murder and manslaughter is often a hardly distinguishable shade of culpability. Shall a man hold his life by the tenor of such a hair's breadth distinction; or rather, did the Legislature intend that he should be liable to lose it on such a distinction? (1 Hale, P. C. 455–6, Lord Morley's Case.)

3d. The impracticability of its execution, in such cases as those last referred to, as a general rule, where it has been attempted, or where it may be attempted, to be enforced, is strong evidence that the common judgment of men cannot acquiesce in it.

Atkinson v. The State.

Mr. Wharton admits that "however clear may be the distinction between the two degrees (of murder), juries not unfrequently make use of murder in the second degree as a compromise." The reason, upon which he accounts for this aberration from duty on their part, is, that they are "unwilling, in consequence of circumstances of mitigation, to expose the defendant to its full penalties (that is, the penalties of murder in the first degree.) (Wharton, A. C. L. 288.) Another reason equally cogent may be added, which is, that the common sense of jurors will, not unfrequently, assume to comprehend the meaning of the familiar words "premeditated and deliberate," used by their own legislators, and cannot conscientiously get their consent to their perversion in a case of awful responsibility. The instinctive judgment of the common mind, when forced into action, in a great and serious crisis, often proves, when philosophically and logically examined, to be the gravest wisdom.

The first of these artificial tests of murder in the first degree, that have been examined and objected to, excludes a large class of the most atrocious murders, and includes cases that could not have been intended to be embraced. The second includes the lowest grade of murder, hardly distinguishable from manslaughter. The adoption of either of these will defeat the object of the law; which must have been to punish capitally, deliberate, intentional murders, and none other.

The charge of the Court below in this case, did not sufficiently draw this distinction between the two grades of murder. And as the facts of this case, contained in the record, required that such distinction should have been drawn, so as to have given the jury an option, accordingly as they may have determined the truth, amidst the conflicting facts, to be, to have found the prisoner guilty of murder in the second degree, as well as in the first degree, the charge was calculated to mislead the jury; and therefore, in reference to the facts of this case, it was erroneous.

The judgment is reversed and cause remanded for new trial.

Reversed and remanded.