The exception to the ruling of the court, permitting the State to challenge a juror who had been tendered to the prisoner, appears in the opinion.
The prisoner presented affidavits, charging improper conduct on the part of the jury and of the officer who had them in charge, and showing, or tending to show, bias on the part of T.C. Tew, one of the jurors, and from said affidavits the court found the following (887) facts:
That eleven of the jurors were shaved by one of their number, in their room in Saturday evening, the third day of the trial, and the other (a colored man) was carried to a barber shop in town, about 200 yards from the room in which the remaining eleven jurors were. The officer, locking the door of said room, put the key in his pocket and accompanied the colored juror to the barber shop and back, and when he returned, found everything as he left it. They were supplied with two quarts of whiskey on Saturday afternoon. One quart was first bought for Sunday, the jurors themselves furnishing the money and the officer buying it for them. Every juror drank out of it; each juror took one drink, consuming one quart. One quart was first bought, and some time after, same afternoon, the other quart. The jurors played cards, from time to time, pending the trial, the cards being furnished by the proprietor of the boarding-house. The friends of the deceased had been boarding at the house to which the jury were carried, but they did not remain there after the jury were carried there; that on another occasion the officer took one of the jurors, who was troubled with his bowels, to a back lot to obey a call of nature, and at the request of the juror, who was complaining of pain, carried him into a saloon, where the juror and officer each took a drink with him, the remaining eleven being left in the room, and the same locked up; that on another occasion one of the jurors requested the officer to take him to a livery stable, not far off, in order to remove his horse to another stable, and the officer did so, and also allowed the colored juror to go with them, leaving the other ten jurors locked up in the room until they returned; that the officer allowed the jurors to use and read the Wilmington Messenger, from day to day, during the trial, which contained what purported (888) to be a full report of the evidence and abstracts of the argument of counsel, instructing them not to read the account of the"Fuller" trial; that on the night before the verdict was rendered, the *Page 552 
jury, without the knowledge or consent of the prisoner or court, were taken by the officer to a prayer meeting in the Baptist Church; that they sat together, the officer sitting with them, and all in his immediate view, and that there was nothing improper in their conduct while at church, going to or from.
The above facts are found by the court upon the affidavits filed by the prisoner and the affidavit of E. M. Waddell, the officer of the jury, which he filed in answer to the rule served upon him for contempt, in violation of his duty as such officer, and which he asked might be read in response to the affidavits as to his conduct.
It was agreed between counsel on both sides that the officer might take the jury to church on Sunday, which he did. This is the only agreement made by counsel as to the jury. HENRY R. BRYAN, Judge Presiding.
The officer, answering a rule, was fined by the court $150 and sentenced to jail for thirty days. Upon the sworn testimony of his physician that imprisonment would imperil his life, he being an old and feeble man, and further testimony of his not having over $50 in property, the fine was stricken out and the judgment suspended.
 HENRY R. BRYAN, Judge, etc.
Facts found by the judge, and his ruling thereon, entered of record:
(889) One of the jurors, J. C. Tew, having been asked the question whether he had formed and expressed the opinion that the prisoner at the bar was guilty, answered in the negative, and was thereupon accepted.
The prisoner, after the verdict, offered the affidavits of S.C. Godwin and J. R. West, tending to show that the juror had expressed an opinion, which affidavits were as follows:
S.C. Godwin, being duly sworn, says: That on Monday, 22 January, 1894, late in the afternoon, affiant had a conversation with J. C. Tew and J. R. West relative to the trial of the Fuller case, in which conversation affiant asked said Tew (who was one of the jurors who tried the case) and West, "What are they doing in the Fuller Case?" to which West said, "They are doing nothing." Affiant then asked them if they were summoned on thevenire, or if the venire was summoned, to which West replied, "No, and they had better not summon us unless they want him (Fuller) hung — had they, John Curt?" (addressing Tew). J. C. Tew then said, "You bet not."
J. R. West, being duly sworn, says: That on Monday of the first week of this term of the court he was at the house of his uncle, S.C. *Page 553 
Godwin, in Flea Hill Township, Cumberland County, in company with the said J. C. Tew, one of the jurors in the above entitled case; that the subject of conversation was the Fuller trial. S.C. Godwin asked if they had summoned the venire. This affiant said, "No, they had done nothing with him yet, and they need not summon me and Tew, because we would hang him — would not we, Tew?" Whereupon, the said Tew said, "You bet we would," or words to that effect.
Upon which foregoing affidavits prisoner asked the court to find that the juror, Tew, was not an indifferent juror at the time he was accepted by the defendant. The court declined to so find, being of the opinion that affidavits were not sufficiently strong. (890)
 H. R. BRYAN, Judge, etc.
The single exception to the charge, which is discussed in the opinion, is set forth therein in full. From the judgment pronounced upon a verdict of guilty the prisoner appealed.
After all of his peremptory challenges had been exhausted, the juror, Hawley, was passed by the State and tendered to and accepted by the prisoner. As the clerk was about to swear him, he asked to be excused, upon the ground that he was an intimate and lifelong friend to the prisoner and connected with him by marriage. Further investigation developed the fact that no relationship, either by consanguinity or affinity, existed between the prisoner and the juror, but that a first cousin of the prisoner had married the juror's second cousin. After correctly ruling that no sufficient cause of challenge had been shown, and after it had been made to appear that the juror had previously asked the counsel for the prosecution to excuse him, but without assigning any reason for making the request, the court overruled the objection of the prisoner and permitted the State to challenge the juror peremptorily.
The statute (The Code, sec. 1200) provides that "In all capital cases the prosecuting officer on behalf of the State shall have the right of challenging peremptorily four jurors, provided said challenge is made before the juror is tendered to the prisoner, and if he will challenge more than four jurors he shall assign for his challenge a (891) cause certain." The right of peremptory challenge is given to *Page 554 
the prosecuting officer, coupled with the express condition that it is to be exercised before the particular juror is tendered to the prisoner, or not at all. The statute imposes no such restriction as to challenges for cause. S. v. Vestal, 82 N.C. 563. Hence, where a juror is tendered to a prisoner, and on voir dire states that he had formed and expressed the opinion that the prisoner is not guilty (S. v. Jones, 80 N.C. 415), or where, even after he is both tendered and accepted, he then, on coming to the book to be sworn, states that he is related to the prisoner within the ninth degree (S. v. Boone, 80 N.C. 461), in either case the court unquestionably has the power to allow the challenge for cause. For the same reason, where the fact of killing was admitted, and a prisoner charged with murder relied upon insanity as a defense, the court had the power to permit the State to challenge a juror who, after being accepted, stated that he was firmly fixed in the opinion that the prisoner was insane at the time of the killing, and that this belief could not be removed by hearing any amount of evidence. S. v. Vann, 82 N.C. 631. Where a prisoner charged with homicide has accepted a juror, and, before the jury is impaneled, the nisi prius judge, acting as a trier, ascertains that the juror has formed and expressed the opinion that the prisoner is not guilty, it is within his sound discretion to allow or disallow a challenge for such cause, and his ruling is not reviewable, as it is not in any such case of challenge to the favor. S. v. Green, 95 N.C. 611. Had the juror, Hawley, stated that he was related to the prisoner within the ninth degree, sufficient cause of challenge would have been shown (S. v. Perry, 44 N.C. 320, and S. v. Potts, 100 N.C. 457), and the exception to the ruling of the court would have been groundless. (892) But the statute defines in plain and unequivocal terms the limit to the right of objection on the part of the State without assigning cause, and fixes unmistakably the extent of time within which it is to be exercised. None of the authorities cited for the prosecution extend the right of peremptory challenge beyond the time of tendering the juror to the prisoner, and if this Court had inadvertently made a ruling so plainly repugnant to and subversive of the provision of the statute, it would have been a hard measure to adhere to such a precedent where human life is involved. The discretionary power of the judge was confined to challenges for cause. He had no more authority to extend the time for making peremptory challenges beyond the limit fixed by the statute than he had to increase the number allowed to the State beyond four. The question of the proper interpretation of the language of the statute is one for this Court, and its meaning seems so plain as to require but little further discussion of this exception, after showing that it has never received a construction different from that which we now place upon it. After the juror had been tendered, it was the right of *Page 555 
the prisoner to demand that he be sworn, unless the challenge had been allowed for cause and not peremptorily on behalf of the State.
After the rendition of the verdict, affidavits were filed, tending to show misconduct on the part of the jury actually impaneled, and of the officer who had charge of them. The judge found the facts bearing upon this subject, and his denial of the motion on that ground is not reviewable here. S. v. Best, 111 N.C. 643. But two affidavits were filed tending to show that one of the jurors who was chosen (John C. Tew) declared on his voir dire that he had not formed and expressed the opinion that the prisoner was guilty; whereas, before he was summoned on the special venire, he had said, in effect, that it would (893) not be well to choose him as a member of the jury, as he would hang the prisoner. When the affidavits were offered, his Honor seems, either of his own motion or at the request of counsel, to have entered on the record proper a statement of the action taken in reference to them. After reciting that the affidavits relating both to the misconduct of the jury and the bias of the juror, Tew, and finding the facts and entering his judgment upon the motion for a new trial in so far as it was founded upon such alleged misconduct, his Honor proceeded to find and enter upon the record proper the finding that Tew had declared on his voir dire that he had not formed and expressed the opinion that the prisoner was guilty, he was chosen and sworn as a juror, the court proceeded to pass upon and enter of record its action on the other branch of the motion for a new trial, and to refuse to find that Tew was not an indifferent juror, because the "foregoing affidavits" (those of West and Godwin, which were evidently spread upon the record as exhibits) were "not sufficiently strong." Instead of questioning the credibility of the affiants or stating broadly that, in the exercise of the discretion vested in him, he refused the motion in so far as it was founded on the alleged bias of Tew, because the affidavits were not sufficiently strong to produce belief in their truth, for credibility does not depend upon the production of a strong, but of an apparently truthful, statement. It is impossible to understand the order of the court upon this branch of the motion for a new trial, the reference in it to the two affidavits recorded with it, and the previous recitation that the court started out to enter a finding as to the bias of one juror, as well as the misconduct of the whole panel, unless we draw the natural, if not irresistible, inference that his Honor intended to find as a fact that the juror, Tew, declared that he had not formed and expressed the opinion that the prisoner was (894) guilty, and then, instead of eliminating the facts from the two affidavits, or falling back upon his discretionary power, to hold as a conclusion of law that, conceding the truth of the allegations contained in the affidavits, they were not sufficiently strong to warrant the *Page 556 
exercise of his discretionary power. It is familiar learning that where anisi prius judge rests his refusal to exercise his discretion upon the mistaken opinion, either that it is not vested in him or that the facts are not such as to call for its exercise, it is error. The rule is so established, because a judge, acting under a misapprehension of the law, might, in cases like that before us, refuse to follow the dictates of a sound discretion solely because he had been misled by an erroneous view as to his power. If the motion had been refused on the uncontradicted affidavits, without comment, or with the statement that it was denied in the exercise of a sound discretion, it would not have been reviewable. S.v. Smallwood, 78 N.C. 560.
It is immaterial whether the court started out to find the facts at the request of the prisoner's counsel or on its own motion. It would have been a work of supererogation to request the judge to do what he was already doing voluntarily. But the principle announced in the recent case of S. v. DeGraff, 113 N.C. 696, and S. v. Best, supra, must not be misunderstood. If the judge, of his own motion or on request of the prisoner's counsel, starts out with the avowed purpose of finding the facts, and then states as a conclusion of law that certain affidavits, if admitted to be true, are not sufficient to call for the exercise of his power, instead of eliminating the facts from the affidavits, it has never been held by this Court that a prisoner who is not in fault, under such circumstances, is precluded from excepting to a mistake of law (895) made by the court as to the extent of its own discretionary power. The judge might have found the facts from the affidavits or other testimony in a very small compass; he might either have declared his disbelief of them, or he might in a few words have claimed the right to exercise a sound discretion, despite the fact that they were filed. He chose to do none of these things, but to rest his ruling upon the idea that the affidavits were not "sufficiently strong." Sufficiently strong to do what, except to accomplish the only purpose for which they could have been filed — call for the exercise of the sound discretion vested in the court? If his Honor had meant he did not deem the affidavits credible, he would have pronounced them unworthy of belief, not wanting in strength. The affidavits might well have been weak or strong, and yet scrupulously in accord with the truth. If counter-affidavits had been filed, the judge would have so stated, and would probably have eliminated his findings from all that were submitted. The impression that the judge distrusted his power is strengthened by the remark, subsequently made in the very moment of announcing his conclusion, that he had never known of an instance where a verdict such as this had been set aside. If a judge is reluctant to pass upon the credibility of such affidavits, yet is unwilling to evade review by falling back upon his *Page 557 
discretion, can we deduce any rule or inference from adjudicated cases that will prevent him from pursuing a course which is so manly and which evinces so just an appreciation of the gravity of the situation? If his Honor deemed the affidavits insufficient in law to evoke the exercise of his power, it was just to the prisoner and creditable to him to allow the case to be so fairly presented. Supposing it to be true, then, that Tew, intending and desiring to insist upon a verdict of guilty of murder in the first degree if selected as a juror, and to have the prisoner hanged, which purpose presupposed either the belief that he was (896) guilty or a corrupt purpose to punish him, even if innocent, falsely declared upon his voir dire that he had neither formed nor expressed the opinion that he was guilty, and thereby contrived to have himself chosen, had the court the power to set aside the verdict and grant a new trial? Where a juror fraudulently procures himself to be selected, and swears falsely that he has not formed the opinion that the prisoner is not guilty, the presiding judge has the power, in furtherance of the duty which the law imposes upon him to see that all trials are fair and impartial, to order a mistrial after the jury has been impaneled on an indictment for murder. S. v. Bell, 81 N.C. 591. And it is not material whether it appears in such a case that the fraud was practiced at the instance of or through the agency of the prisoner, or with his subsequent assent. It was held sufficient that he was about to avail himself of the benefit of it. S. v. Washington, 89 N.C. 535; ib., 90 N.C. 664. However rarely it may become the duty of a presiding judge to exercise the power to grant a new trial where a prisoner is found guilty of a crime punishable with death, there can be no question as to its existence. Thompson M. on Juries, sec. 302; S. v. Tilghman,33 N.C. 552. What is ordinarily left to sound discretion becomes a high duty when it is once conceded that justice has miscarried by the fraudulent contrivances of a juror, in procuring his own selection by perjury. If it be true that the juror, Tew, was so full of prejudice as to declare, in effect, that if chosen he would endeavor to have the prisoner hanged, and that he afterwards imposed himself on the counsel as an indifferent juror, it is manifest that the trial of the prisoner, in so far as this particular juror was a factor in it, was a mockery of justice. If the affidavits were believed, they unquestionably showed facts that justify the setting aside of the verdict. It is true that we may expect (897) such evidence to be adduced often, when the presiding judge can, from his standpoint, see that it is not to be relied upon, but in all such cases he has but to rest his decision upon the sufficiency of his own power rather than the insufficiency of the testimony to make it no longer the subject of review here. We do not hold, nor is it necessary that we should decide, that evidence of fraudulent intrusion of such a *Page 558 
juror into the panel, if believed, would make it in all cases, even where there is no reasonable view of the evidence consistent with the innocence of the prisoner, the imperative duty of the presiding judge to grant a new trial. If the affidavits, admitting their truth, were sufficient to warrant the exercise of the discretionary authority of the court, the ruling was erroneous. We think that if the fraudulent intrusion of a friend of a prisoner accomplished by swearing that he has never expressed the opinion that the prisoner is not guilty, is sufficient ground for a new trial, the justice and reasonableness of the converse proposition must be conceded also. The fact that an enemy has contrived by perjury to get into the panel in order to convict is sufficiently potent as evidence of injustice and wrong to the prisoner to justify the judge in setting aside the verdict, in the exercise of the power intrusted to him to meet just such extraordinary emergencies. We think, also, that the first exception to the charge is well taken, and must be sustained.
In defining murder in the first degree the court said: "The killing being admitted, and nothing else appearing or proved, the court charges you that no presumption is raised that it is murder in the first degree, and unless the circumstances show beyond a reasonable doubt that there was a deliberate, premeditated, preconceived design to take life, it is murder in the second degree. The act should not only be wilful, (898) premeditated, malicious, but it must have been committed with the formed intention to take life — a fixed design that the act shall result in the death of the party assaulted, a fully formed, conscious design to kill, and with a weapon prepared for the purpose. Premeditation may be inferred or presumed from the use of a deadly weapon in the possession of the party using it, unless the contrary be made to appear." The prisoner could not justly complain of the proposition embodied in all that precedes the last sentence of the foregoing extract from the charge. The mere fact of killing, when admitted, raised no presumption that it was murder in the first degree, and it was the duty of the jury, unless they were satisfied beyond a reasonable doubt that there was a deliberate, premeditated and preconceived design on the part of the prisoner to take life, and that the act of killing was committed in pursuance of such fixed design, to find the prisoner guilty of no higher offense than murder in the second degree. When the jury were told that they were at liberty to presume or to draw the inference from the mere fact that a deadly weapon was used, leaving out of view any other evidence offered to show that the prisoner was in the very act of killing, pursuing a deliberate and preconceived purpose, a very grave question was raised, which it is the duty of this Court to settle in this, the very first case involving a construction of the late act defining what constitutes murder in the first and second degrees. Unquestionable, now, just *Page 559 
as before the enactment of the statute, the use of a weapon likely to produce death raises a presumption of malice, and, therefore, the jury may infer, when there is evidence that the killing was done with such a weapon, that the person charged is guilty of murder in the second degree. S. v. Townsend, 66 Iowa 741. But the use of a deadly weapon does not ispo facto bring a killing within the definition of a murder "perpetrated by means of poison, lying in wait, (899) imprisonment, starving, torture, or by any other kind of wilful, deliberate or premeditated killing, or committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony," but relegates it as a merely technical murder, depending upon the artificial weight given to testimony, to the second class. Probably ninety-nine out of every hundred homicides are caused by the use of a deadly weapon, and if in every case where its use is provoked by insulting language (not deemed provocation in law), which is resented with fatal result on the spur of the moment, the offense is presumably murder, but little has been accomplished by the legislative attempt to classify cases which before fell within the definition of murder, and to subject to the death penalty only the more heinous offenders. The Pennsylvania statute is substantially the same as ours, and by that statute the first classification of criminal homicides into two degrees of murder and manslaughter was made in this country. 2 Bishop Cr. Law, sec. 703. Prior to the statute (says Bishop, sec. 726) every killing of "malice prepense" was murder. "Since the statute, when to this another degree of malice is added, the particular killing becomes in the first degree, but when there is no such addition made, it is murder in the second degree." The intentional killing with a deadly weapon raised a presumption, not of premeditation or deliberation, but of malice only. 19 A. E., 65; S. v.Collins, 30 N.C. 407; S. v. Willis, 63 N.C. 26; S. v. Brittain,89 N.C. 502. When, therefore, not only proof of malice, but of something more, was made requisite for a conviction for the capital felony of killing, the prosecution could no longer make out a prima facie case of premeditated and deliberate murder by evidence which gave rise to a presumption of the malice only. Under the operation of the new law every slaying upon provocation deemed sufficient in law to (900) arouse anger, and under the influence of the passion thus engendered, is manslaughter, though done with a deadly weapon. But, in the absence of such mitigating circumstances, the law presumes malice from the manner of killing, just as it did before its enactment. The existence of malice, however, if admitted or presumed from the use of a pistol, does not of itself warrant the inference of premeditation, though the preparation and use of the pistol doubtless is evidence proper to be submitted with other facts and circumstances as tending to show the existence *Page 560 
both of premeditation and deliberation. "Where the act is committed deliberately with a deadly weapon," says Wharton, 2 Cr. Law, sec. 944, "and is likely to be attended with dangerous consequences, the malice requisite to murder will be presumed." It has been held by the Supreme Court of Pennsylvania, construing the statute reenacted here almost in totidemverbis (S. v. Drum, 58 Pa. St., 9), that while the use of a deadly weapon is prima facie evidence of malice, and while the fact that it has been intentionally used to inflict a mortal wound, throws the burden upon the accused to show circumstances that will mitigate the killing to manslaughter, the presumption raised is no higher than that the homicide is murder in the second degree. In order to constitute murder in the first degree, there must be evidence of express as contradistinguished from implied malice. "Any unlawful killing of a human being with malice aforethought is murder; but if nothing further characterizes the offense, it is murder in the second degree; to constitute higher offense, it is murder in the second degree; to constitute higher offense, there must be wilfulness, deliberation, premeditation." People v. Cox, 76 Cal. 285.
In the case of Romans v. State, 41 Wis. 312, the Court approved the instruction that the jury would find the defendant guilty of murder (901) in the first degree if they should find from the evidence, not only that he "shot deceased and thereby caused his death," etc., but provided, also, they should "believe from the evidence, beyond a reasonable doubt, that the defendant did the shooting with the premeditated design to kill the deceased." It must appear "not only that the defendant is guilty of feloniously killing the deceased, . . . but that such killing was done wilfully, deliberately and with premeditation." Wharton Homicide, 368. Where the presumption of slaying with malice aforethought only is raised, the proof falls short of justifying the inference of guilt by failing to amount also to prima facie proof of premeditation and deliberation, which are essential elements of the higher crime. Wharton,supra, 369; Green v. State, 45 Ark. 281;Atkinson v. State, 20 Tex. 522[20 Tex. 522]. That a homicide may be wilful in so far as the intent is evinced by the use of a weapon likely to produce death, and yet not deliberate or premeditated within the meaning of the statute, seems to be generally conceded by the courts, where the words of our statute have received an interpretation. S.v. Hill, 69 Mo., 451; McQueen v. State, 1 Lea (Tenn.), 285; Aveline v.State, 64 Ind. 96.
Where the presiding judge, in defining the two degrees of murder, inadvertently instructs the jury that the fact of killing with a deadly weapon, when admitted, raises the presumption or justifies the inference that there was premeditation instead of malice, it is necessarily an incurable error. No subsequent proposition inconsistent with that can be held to have removed the erroneous impression fastened on the minds *Page 561 
of the jury in the beginning; but, while the court reiterates in many forms the instruction that it is incumbent on the State, in order to a conviction of murder in the first degree, to show beyond a reasonable doubt that there was both premeditation and deliberation (902) there is in fact nothing in the charge clearly inconsistent with the idea that the jury were still left to draw the inference that there was premeditation from the bare fact that a pistol was used by the prisoner to inflict the mortal wound.
The passage of the act of 1893 marks an era in the judicial history of the State. As far as we can ascertain, every other State had previously divided the common-law kind of murder into two classes. The theory upon which this change has been made is that the law will always be executed more faithfully when it is in accord with an enlightened idea of justice. Public sentiment has revolted at the thought of placing on a level in the courts one who is provoked by insulting words (not deemed by the common law as any provocation whatever) to kill another with a deadly weapon, with him who waylays and shoots another in order to rob him of his money, or poisons him to gratify an old grudge. So long as artificial proof of malice is allowed to raise the presumption of murder, this new law will fail to accomplish the object for which it was framed. Elsewhere the courts have generally followed the lead of Pennsylvania, and we, too, have adopted the interpretation given by her courts to the law which our Legislature has borrowed from her statutes. It is not the severity of laws, but the certainty of their execution, that accomplishes the end that should be always in view in enforcing them. Heretofore, public opinion has approved and often applauded the conduct of juries in disregarding the instructions of judges as to the technical weight to be given to the use of a deadly weapon. The consequence has been that, a lax administration of the law being tolerated in such cases, other juries have constituted themselves judges of the law as well as of the facts, when proof has shown a more heinous offense. The experience of a few years will probably demonstrate here as (903) elsewhere that fewer criminals will escape under a law which is in accord with the public sense of justice than under one which makes no discrimination between offenses differing widely in the degree of moral turpitude exhibited. For the reasons pointed out, the prisoner is entitled to a
New trial.