The defendant was tried upon a bill of indictment charging her with the murder of one Ollie Moore. Upon defendant's plea of not guilty, the solicitor announced in open court that the State would not ask a conviction of murder in the first degree, but only of murder in the second degree or manslaughter, as the facts might warrant.
The evidence for the State tended to show that a party was held at the house of the defendant and her husband on the night of the homicide in celebration of the departure of the husband for Ohio.
The deceased came to the party some time after it had been in progress — in fact, about 12:00 o'clock p.m. He took hold of the defendant's hand in an endeavor to look at her wrist watch, called her "Miss Bitch," and inquired what time it was. Defendant referred to him as a "big shot" and told him to get out and go home and find out what time it was.
During the progress of the party deceased began whispering to one of the guests, Fred McAllister, and defendant demanded that he quit whispering and leave.
The husband, Leon DeGraffenreid, prior to his departure sought to quell the disturbance, and when leaving, requested them all to go home.
Some time after DeGraffenreid had left, some members of the party came back into the house for one purpose or another, a part of them to secure some phonograph records that had been borrowed. Deceased reentered the house and reclined upon the sofa, with his head back and his mouth open as if asleep. The defendant ordered him to leave. He said that he would do so, but that he did not like something she had previously said. Defendant reiterated her request that he leave the house, and defendant and deceased began cursing. Deceased either threw defendant *Page 114 
down upon the sofa or she sat down in consequence of being pushed. She then got up and went into the kitchen, returning with both hands behind her and telling deceased that he would leave. Both of them surged towards the door, and some of the State's witnesses saw defendant with an uplifted knife in the attitude of striking deceased. He immediately cried out that he was cut and went outside the door, whence he was carried to the hospital at Sanford, dying a short time thereafter.
The State's evidence was to the effect that defendant had stated that she stabbed deceased with a table knife, which later was found on the mantelpiece, covered with blood. However, just outside the door there was found a butcher knife, covered with blood and dirt.
The defendant's witnesses testified that deceased was known to be a person of violent disposition, having a record of vicious assaults, and that he had before had altercation with defendant's husband. He was some twenty-five or thirty pounds heavier than defendant.
The defendant testified in her own behalf substantially as follows:
"Ollie Moore came to the party at my and my husband's house without any invitation. He had last year, before this, come to our house to a party and cut up rough and broke up the party and caused everybody to leave.
"On October 9th, Ollie Moore came a few minutes before Leon, my husband, left. When he came in he took hold of my arm and raised it like he was trying to look at my wrist watch and said, `Hello, Miss Bitch, what time is it?' I told him he was such a big shot that if he wanted to know what time it was, to go home where he belonged and find out; that we did not want him there. He turned to Freddie McAllister and said, `When Leon's gone we'll take the house.' Leon heard him and told them to please behave and not to make any disturbance. In a few minutes he went over and went to whispering with Freddie McAllister, and I again told him to leave and do his whispering elsewhere out in the street or on the railroad. I was afraid of him. He had gone to the hardware store where my husband worked, after breaking up the other party at our house, and my husband had trouble with him then about that. He had the name of having beaten up his aunt, and his sister's husband and of having had trouble with other people, and had the reputation in the community of being violent and being a very violent man. He was 25 or 30 pounds heavier than I was, and taller, broader and stronger. He had been drinking and was fussy that night, October 9th, when he came. There was being served no whiskey at the party, and I do not think he drank any after he came.
"When we went out to see Leon off, everybody went out, and my husband told these boys not to give any trouble, and he asked everybody to leave and told them good-bye. I went back in the house and Iredell *Page 115 
Buie went with me to get some records of Iredell Buie's we had been playing, so she could carry them home, and some of the people followed us back in. The party was over when Leon left.
"While I was getting these records I saw Ollie Moore had come back in. He was sprawled over on the davenport, with his head on one arm of it, and one leg over the other, and one foot on the floor. His eyes were shut and his mouth open. When I saw him I ordered him to get up and leave the house, and told him he could not be sleeping or doing that way at my house with my husband gone. When I spoke to him he straightened up and leaned back against the back and shut his eyes. I again ordered him to get up and leave. I went up in front of him this time. When I told him the second time that he could not be sleeping there and to go, he said he would leave, but that I had said something before he did not like. I ordered him again to leave. He grabbed me by the arms and shoved me down on the davenport and said he would leave when he damned pleased and called me `Miss Bitch.' I called him another and told him to leave the house. When I got up from the davenport, the kitchen door was open and I noticed the door of the electric refrigerator had been left open by someone. I went in and closed that and came out and he was still there, standing about the middle of the floor. I told him if he did not leave I would send for Policeman McLeod. He said, `Damn the law,' and I went over and turned the front door knob and began opening the door and told him, `Get to hell out of here.' When I did, he jerked me so hard it slammed the door back closed, and everybody but us began running out of the back door.
"I called for help, but no one helped me. He pushed me back against the wall to the east of the front door so my back was against it, and I was half on and against a little iron table which was a few feet to the east of it against the wall. He had me partly on this table and had me by the throat with his left hand and struck at me with a knife. I threw my left hand up and he cut me between the thumb and first finger through the web joining them, and down in the palm of the hand. The scar is there now.
"He had me up against the wall and against the table and one of his legs was between mine and was forcing me back on the table and against the wall. When he cut me I called for help but no one helped me. While he had me against the wall and table, I picked up a butcher knife on this table where I had been using it in opening sardines in fixing sandwiches for my husband to take with him. The table tilted up and slipped from under me and I was standing up, stabbing the knife toward him to keep him off of me and telling him to stand back and not come on me. *Page 116 
"I did not intend to kill him, but only to make him stand back and stay off me, and to turn me loose and quit fighting me and let me alone. I told him to stand back and he came on, kept on coming, and pushed me against the wall again and by the force of his lunge toward me at this time he caused the knife to go into his body. Except for what he did himself, and the force he used, he would not have been seriously injured or killed. I did not strike at him hard enough to go into his body. He called out I had cut him, and he went out the front door and came back in before he bled any. Some of the boys got him in an automobile and carried him off."
Other parts of the evidence are not essential to an understanding of this decision.
Upon this evidence and relating to the matter of self-defense, the court charged the jury as follows:
"The principle of self-defense rests upon necessity, real or apparent, and cannot avail if there is a reasonable opportunity to retreat and avoid the difficulty; but if the assault in which the killing is brought about be violent and the circumstances are such that retreat would be dangerous, he is not required to retreat."
Elsewhere in his charge, the following instruction was given to the jury:
"If the deceased assaulted the prisoner in her own home and cut her with a knife and otherwise suddenly and violently assaulted her when he was requested to leave and the prisoner was without fault in bringing on the difficulty, the Court charges you that she did not have to retreat but she had the right to stand her ground and oppose force with force and to do whatever seemed to her at the time reasonably necessary to protect herself from the assault being made on her. And if at the time deceased was killed she had reasonable grounds to believe and did believe that she was in danger of losing her life or suffering great bodily harm as the result of an unlawful assault by deceased, she had the right if necessary, or if it at said time reasonably appeared to be necessary, to take the life of the deceased, and if you find beyond a reasonable doubt that she intentionally killed the deceased in such reasonable bona fide apprehension, that the same was necessary to protect her life or her person from great bodily harm, your verdict would be `not guilty.'"
The jury found defendant guilty of manslaughter and judgment thereupon was rendered, sentencing the defendant to not less than ten years, nor more than twenty years in State's Prison.
The defendant appealed, assigning errors.
Counsel for the defendant argues here that the instructions given to the jury, as quoted above, do not fairly present to the jury the full right of self-defense which might be her due on certain phases of the evidence, particularly with regard to the necessity of retreating from an assault made upon her in her own house.
However much the evidence contra may preponderate, any phase of the evidence supporting the plea of self-defense demands that the instruction addressed thereto must apply the law to the facts which such evidence tends to show. S. v. Anderson, post, 148. There is, of course, no general rule or formula of expression which will apply the law of self-defense to every case. In the instant case, defendant complains that the jury might be confused with conflicting instructions and be unable to decide whether, under the law, it was the duty of the defendant to retreat from the assault made upon her before killing in self-defense or whether she might stand her ground, under the evidence which she herself advances that she was the victim of an unprovoked assault in her own home.
In the first place, it is pointed out that there was no necessity for presenting an inapplicable rule, designated by the State as a general rule — one which would require her to retreat under such conditions; and if the second instruction could be, for argument's sake, conceded to be correct, the jury would be still left in doubt as to which instruction they should follow.
We think, however, that there is an inadvertent statement, of a more serious nature, in the instruction which the State regards as curative, which would deny it that office. In this instruction the court would deprive the plea of self-defense of any effectiveness, unless proved to the jury beyond a reasonable doubt. In order to secure an acquittal on a plea of self-defense, it is only necessary that the accused establish the facts upon which it is predicated to the satisfaction of the jury. S. v. Beachum,220 N.C. 531, 17 S.E.2d 674; S. v. Fuller, 114 N.C. 885,19 S.E. 797.
In principle this case seems to be substantially on all fours with S. v.Roddey, 219 N.C. 532, 14 S.E.2d 526, from which we quote:
"Defendant appropriately contends that while the doctrine of retreat enunciated in these instructions may be correctly applied to different factual situations, it does not apply to a controversy in a man's home, as in the present case. Hence, he contends that, even though the court did further instruct on the right of a man to protect his home and family, the instructions to which exception is taken are calculated to mislead the jury to his prejudice. With this contention we agree."
For the reasons stated, the defendant is granted a
New trial. *Page 118