STATE v. GABRIEL THOMAS.

*Murder—Husband's Chastisement of Wife—Evidence of Malicious Intent.*

1. The recent decisions of this Court upon the distinction between murder in the first and second degrees and manslaughter reviewed and distinguished by AVERY, J.

2. On an indictment for murder the omission of the judge to explain to the jury the application of the testimony to the theory of murder in the second degree is error.

3. Where a husband beat his wife and she died in consequence— her neck being broken somehow in the scuffle—and during the beating the husband said he would "take something and kill her," but in fact used no deadly weapon in killing her, the use of the expression under the circumstances is not evidence of such a specific premeditated intent to take life as will constitute murder in the first degree.

CLARK and MONTGOMERY, JJ., dissent.

The prisoner was indicted for the murder of Louisa Thomas, his wife. The evidence was as follows :

Daniel Simmons testified : " On the 12th of July last, near the mouth of Trent creek, I was fishing. Prisoner and his wife passed us in a boat. I spoke. They went down, stopped, and fished a little, then went to Mason's Point, fastened the boat to a poplar stake on Bay river. George Jones and I passed them, and they came back. We fastened our boat, and went to fishing. Directly I heard a screaming down at Mason's Point, looked around, and heard a beating like striking with a fishing pole. This went on for five or ten minutes. I heard an argument between the prisoner and his wife. Heard him say, 'If you don't hush, I will take something and kill you.' Directly after that I heard a heavy lick. I looked down that way and saw him in the boat. Could not see her.

After I missed her he struck two more heavy licks. Immediately after he struck those licks he stooped down, picked his wife up, and threw her overboard. Then he stood up in the boat, looked around a minute or so, unloosed his boat, and came down where we were. George Jones, Malinda Russell, D. Best, and Ed. Russell were there with me. George Jones and myself were in one boat and the others in another, as far apart as from here to the door. The wind was north-east. The prisoner was north-east of us. When he came up, he said something about ' the darling of his, all the friend he had, being overboard.' Malinda Jones asked him if he killed Laura. He said, ' No, I have not put my hands on her.' She said, ' Did I not hear you beating her ? ' He said he did not put his hands on her. This was on Friday, about 5 o'clock p. m. On Saturday following, between 11 and 12 o'clock, the body was taken up. We went down to the place. The stake had been moved. We found her where the stake had been moved. This was the place where they were the day before. She was dead. I did not notice her condition." On cross-examination the witness stated that the prisoner asked him to go and help get her up. " When he first came to us he said he would knock her in the head. I was half mile from the prisoner at the time. I have heard it said to be half mile from Mason's Point to the mouth of Trent creek."

George Jones testified : " On the 12th of July, 1895, I was at the mouth of Trent river in a boat. Prisoner and his wife were in a boat at Mason's Point, half a mile away. I was fishing. Heard a screaming down the river. After the screaming, I stopped, and looked down that way, and saw his wife go overboard into the river. Prisoner was standing in the boat at the time. Then he left the stake, and came to Malinda Russell's boat, which was 50 yards from where I was. As soon as he got there he com-

plained that he had lost all the friend he had, applied to Daniel Simmons to get his wife up. Simmons said, ' You will have to get an officer.' I called Simmons' attention to it, and he said, ' Yes, I saw it.' "

D. Best testified : " I was near the mouth of the Trent, fishing. Heard screaming down the river. Prisoner's wife kept crying. Heard him say, if she did not hush, he would knock her in the head. During the time she was crying, there were two in the boat. Prisoner came up to us, and asked Simmons to help him get his wife up ; that she had fallen overboard. Simmons said he would have to get an officer."

Malinda Russell testified : " I was at Swindell's Bay. Could see Mason's Point, half a mile away. Heard a woman scream—burst out crying. Prisoner told her if she did not hush he would knock her in the head, or burst her head, I don't remember which."

Dr. Redding testified : " I am a practicing physician since 1842. Examined the body on the 15th of July. Found it lying on platform. She was dead. I made a partial post-mortem examination. The neck was broken. I made incision from base of skull. The bones of the neck were dislocated. This would produce instant death. Her lungs were collapsed. No water in the body. She could not have been drowned. She was dead before she went into the water. It is possible for a fall to dislocate the neck. I don't think a fall from the boat would be sufficient to produce the dislocation."

H. R. Simmons testified : " I was at Mason's Point on south side on the day mentioned. Prisoner and his wife were opposite Mason's Point in the boat—canoe about 24 feet long and 2 feet deep. The bait gave out. I went ashore, and while there I heard a screaming up the river.

Wind was north-east when I went ashore.   Prisoner was at stake, and when I came out he was gone."

His Honor charged the jury as follows:

" The burden of proof is upon the State to satisfy you beyond a reasonable doubt that prisoner feloniously slew the deceased.   Prisoner is not required to show his innocence, and the fact that he has not gone on the witness stand, or introduced any evidence, is not to receive any consideration in your deliberations.   The State is required to satisfy the jury beyond a reasonable doubt of the guilt of the prisoner ; and if the State has so satisfied you, then your next inquiry is as to what degree of crime has been committed—whether murder in the first degree, murder in the second degree, or manslaughter.   The jury are instructed that, under our statute, the prisoner cannot be found guilty of murder in the first degree unless the jury are satisfied from the evidence, beyond a reasonable doubt, not only that he is guilty of feloniously killing the deceased, but it must further appear from the evidence, beyond a reasonable doubt, that such killing was done willfully, deliberately and with premeditation ; that is, that it was done intentionally and with prior deliberation. And unless all these appear from the evidence, beyond a reasonable doubt, the jury cannot find murder in the first degree.   While the law requires, in order to constitute murder of the first degree, that the killing shall be willful, and premeditated, still it does not require that the willful intent, premeditation or deliberation shall exist for any length of time before the crime is committed. It is sufficient if there was a design and determination to kill distinctly formed in the mind at any moment before or at the time the blow was struck ; and in this case, if the jury believe from the evidence, beyond a reasonable doubt, that prisoner feloniously struck and killed deceased, as

charged in the indictment, and that before or at the time the blow was struck he had formed in his mind a willful, deliberate and premeditated purp se and design to take the life of the deceased, and that the blow was struck in furtherance of that design and purpose, and death ensued from the effect of the blow, then he would be guilty of murder in the first degree. To constitute murder in the first degree, there must have been an unlawful killing, done purposely, and with premeditation and malice. If a person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree, however short the time may have been between the purpose and its execution. It is not time which constitutes the distinctive difference between murder in the first degree and murder in the second degree. Deliberation and premeditation are essential in order to constitute murder in the first degree; it matters not how short the time, if the party has turned it over in his mind, and weighed and deliberated upon it. Manslaughter is the unlawful and felonious killing of another without any malice, and without any mature deliberation whatever. If two persons fight upon a sudden quarrel, and one slays the other, having the passion suddenly aroused, and without malice, it is manslaughter. If the jury should believe from the evidence that the prisoner and deceased were engaged in a sudden quarrel and fight, and that the prisoner slew the deceased, then it would be manslaughter."

The prisoner prayed the court to charge the jury that the denial of the prisoner of the charge of killing his wife at the time he went up to the boat should be taken as evidence in his favor. This was given. The prisoner prayed the court to charge the jury that, if they believed the evi-

dence to be true, it would not justify a verdict of murder in the first degree. This was refused, and prisoner excepted.

There was a verdict of guilty of murder in the first degree, as charged in the indictment. The prisoner moved to set aside the verdict on the ground that it was against the weight of evidence. The motion was overruled, sentence of death was pronounced, and the prisoner appealed.

*The Attorney General*, for the State.
No counsel, *contra*.

AVERY, J : Following the courts of Pennsylvania in the interpretation of a statute substantially in the same words, this Court construed the Act of 1893 as imposing upon the State, where a conviction is asked for murder in the first degree, the burden of proving beyond a reasonable doubt, not simply actual malice or a killing with a deadly weapon, from which malice would be presumed, but, in addition, that the killing was done in pursuance of " a deliberate, premeditated and preconceived design on the part of the prisoner to take the life " of the deceased. *State* v. *Fuller*, 114 N. C., 885. In *State* v. *Norwood*, 115 N. C., 789, which next came up for review, it was settled that, if the prisoner once formed " the fixed design to take life," it was immaterial how soon after deliberately determining to do so the purpose was carried into execution. The prisoner in that case confessed to her mother that she wished " to get rid of" her baby, because it would prove such a bother to her the next spring, and she was " thinking how she would get rid of it," when it began to cry, and she stuck a pin down its throat, and it strangled. The next indictment under this statute (*State* v. *McCormac*, 116 N. C., 1033) was one where there was circumstantial testi-

mony tending to show the deliberate preparation of two pistols in the early part of the night (prisoner and deceased both having spent the night till the killing was done at two o'clock in the morning, at the same house). It was further in evidence that, just before the killing, a witness stepped out into the yard, leaving a lamp burning in the piazza, where the prisoner and deceased were, and that thereupon the light was extinguished by the prisoner, when, after walking off as if about to leave, he turned suddenly and shot the deceased, saying as he fired, "guess that will do you," and that he laid one of the pistols at the feet of the dead man, exclaiming as he did so, "I reckon you will let me alone now." Except the testimony of the prisoner, there was no evidence tending to show that at the time of the shooting there was any quarrel or dispute in progress, or that the deceased was talking with or even looking toward the prisoner. The court held that it was not error to submit to the jury, with proper instructions, the question whether the testimony was sufficient to show beyond a reasonable doubt that the killing was done deliberately and after premeditation. The Court held also that it was not necessary to show that the purpose to kill was conceived before that evening, spent at the house where the killing was done. In *State* v. *Covington*, 117 N. C., 834, the prisoner said in his confession to a comrade, "I watched my chance and jumped on the old man and wrenched his pistol, and the old man hollowed, 'murder!' Then I shot him through the body. *I aimed to shoot him*, and this must have been when I shot him through the neck." The prisoner had broken into the store of the deceased, and it was shown that the wound in the neck was fatal. There was no other evidence of the circumstances attending the killing, except the confession, and it was held that it was not

error to instruct the jury that the prisoner was either guilty of murder in the first degree or not guilty. The ruling rested upon the ground that, according to the confession, which was the only evidence, the prisoner " aimed " to kill and formed the design to do so, not in the heat of passion aroused by a combat, but when the deceased had acknowledged that he was vanquished, and with the manifest motive of concealing the crime of breaking into the store. In reviewing these cases we find different combinations of facts and circumstances, which, if believed, warrant a jury in finding that there is a " fixed or deliberate, premeditated and preconceived design " to take life, and they illustrate the application of the abstract rule. But this Court has never as yet ventured to give a more specific definition of the mental process which the Legislature intended to describe by the use of these words than the general one given in *Fuller's* case. It is inaccurate to say that, whenever there is an intent to kill, the homicide belongs to the class of murderers in the first degree, because it often happens that one of the parties to a fight conceives the purpose in the heat of the combat to take the life of his adversary and carries it into execution by the use of a deadly weapon, and yet the offence is only manslaughter at most, and may be excusable homicide. *State* v. *Wilcox*, at this Term. But in order to meet the requirements of the statute, the State must show what is called a " specific intent." Wharton says ( 1 Criminal Law, Sec. 377 ): " The general definition of the Pennsylvania and cognate statutes does not affect the common-law distinction between murder and manslaughter. It simply divides murder into two classes ; murder, with a *specific deliberate intent* to take life, being murder in the first degree ; murder, without such an intent to take life, being murder in the second degree........Whenever, then, in the

STATE v. THOMAS.

case of *deliberate* homicide, there is no *specific intention* to take life, it is murder in the second degree." The word which marks distinctly the two degrees is "premeditated," the definition of which, in *State* v. *Snell*, 78 Mo., 243, quoted with approval by Wharton, in 1 Criminal Law, Sec. 380, note, is "thought beforehand for any length of time, however short." "To say that murder was of the first degree, simply because it was intended at the moment, (said Freeman in his note to *Whiteford* v. *Commonwealth* 18 Am. Dec., 781,) would be to construe the words 'deliberate and premeditated' out of the statute." "It is a perversion of terms (said the Court over which Chief Justice COOLEY was presiding in *Nye* v. *People*, 35 Mich., 16) to apply the term 'deliberate' to any act which is done on a sudden impulse." "An intent to kill may exist in other degrees of unjustifiable homicide, but in no other degree is that intent formed into a *fixed purpose* by deliberation and premeditation." *Com.* v. *Jones*, 1 Leigh, 610. This intent is defined by others as a steadfast resolve and deep-rooted purpose, or a design formed after carefully considering the consequences. *Atkinson* v. *State*, 20 Texas, 522. "The fixed resolve to kill, (say the Court of California in *People* v. *Foren*, 25 Cal., 361,) which belongs to murder in the first degree is something different from the *minor quality of intention*, which lacks the marked and distinguishing characteristics of deliberation or *cold premeditation*." The same state of mind is described as "a cool state of the blood" in *State* v. *Carter*, 70 Mo., 594.

Where the killing is not done by lying in wait, poisoning, or in any of the specific ways pointed out in the statute, and the test of its classification as murder in the first degree is the question whether there has been premeditation and deliberation, the prosecuting officer cannot rest the case for the state and rely upon proof of the previous

118—71

existence of actual malice, any more than he can upon the proof or admission even of the constructive malice, (as in *Fuller's* case, *supra* ) that is presumed from killing with a deadly weapon.

The Supreme Court of Alabama, in *Fielder* v. *The State*, 51 Ala., 348, illustrate the change that has been inaugurated by such statutes as ours, when they approve, as a modern definition of murder in the second degree, as distinguished from those more specifically described and those where there is premeditation and deliberation, a definition that would have answered for the common law offence, viz. : " The unlawful killing of a reasonable person, with malice aforethought, either express or implied." The common-law offence included those homicides effected by poisoning, lying in wait, or torture, and recognized no distinction between such revolting acts and the killing where one, under the influence of passion engendered by the grossest insult, slays another with a deadly weapon. The innate sense of justice implanted in the breast of every good man demanded that a distinction should be drawn between cases where there was actual, though not legal provocation, and those where a fixed purpose was shown, whether from malignity or a mercenary desire for money.

" Aside from murder in the commission of the enumerated felonies, (says Wharton, 1 Criminal Law, 391,) the rule is that, where the deliberate intention is to take life, and death ensues, it is murder in the first degree ; where it is the intention to do serious bodily harm, and death ensues, it is murder in the second degree ; where the intellect is so confused by drink or stimulants, or by undue and yet not homicidal passion, as to be incapable of deliberation, (Sections 379 and 389,) and where the killing is done in the attempt to commit any other unlawful act than

those enumerated in the statute, but with no design to take life, though the slayer would be guilty of murder at common-law, it is now only murder in the second degree." Wharton, *supra*, Sections 389–392 ; *State* v. *Johnson*, 40 Conn., 136 ; *Com.* v. *Hagerty*, Lewis C. L., 403 ; *State* v. *Ellis*, 74 Mo., 207 ; *State* v. *Kittosky*, 74 Mo., 207; *Newbury* v. *Com.*, 98 Pa. St., 322 ; *State* v. *Robinson*, 20 W. Va., 713. In order to constitute deliberation and premeditation, something more must appear than the prior existence of actual malice, or the presumption of ·malice which arises from the use of a deadly weapon. Though the mental process may require but a moment of thought, it must be shown, so as to satisfy the jury beyond a reasonable doubt, that the prisoner weighed and balanced the subject of killing in his mind long enough to consider the reason or motive which impelled him to the act, and to form a fixed design to kill, in furtherance of such purpose or motive. *Anthony* v. *The State*, 10 Tenn., (Meigs,) 272 ; *State* v. *Sharp*, Mo. Rep., 218 ; *State* v. *Jones*, 1 Houston Cr. Law, (Del.,) 21 ; *State* v. *Boyle*, 58 Iowa, 524.

It is the province of the jury to pass upon the proof of intent, and the prisoner had no cause to complain that the court told the jury " that it was sufficient to constitute murder in the first degree that there should be a design and determination to kill, distinctly formed in the mind at any moment before or at the time the blow was struck," if the killing was in any phase of the testimony of that grade of homicide. If it were conceded that the vague threat of the prisoner " to knock his wife in the head if she did not hush crying" was sufficient to be submitted to the jury as evidence of a specific purpose to kill, distinctly formed in the mind, there would be another difficulty in that the court failed to define murder in the second degree, or to apply the testimony to the theory that such

was the nature of the offence committed, and charged the jury in such a way as might well have produced the impression on their minds that they must convict of either murder or manslaughter. They could not convict of manslaughter because the specific instructions to the jury upon that point were that, if they "should believe from the evidence that the prisoner and deceased were engaged in a sudden quarrel and fight, and that the prisoner slew the deceased, then it would be manslaughter." There being no actual evidence of a fight between the prisoner and deceased, the jury were left to grope in the dark as to their duty in case they were not satisfied by the State beyond a reasonable doubt that the prisoner acted upon a fixed purpose to kill, distinctly formed in his mind. If they concluded that there was a quarrel or argument, and in the heat of sudden passion, engendered by disagreeable language, which would not have been provocation sufficient to bring the offence within the definition of manslaughter, the crime, under the construction given by our Court and elsewhere, was murder in the second degree. *State* v. *Fuller*, 114 N. C., at p. 902; *State* v. *Lewis*, 74 Mo., 224; *State* v. *Ellis* and *State* v. *Wittosky*, *supra*: *State* v. *Boyle*, *supra*, at p. 524. Every killing which is embraced in the definition of murder at common-law must be classified as a murder in the second degree, unless, on the one hand, it is done in the heat of passion excited by some act, such as an assault, which at common-law was sufficient to reduce the offence to manslaughter, or is done carelessly, but not recklessly; or, on the other, is either the result of a fixed and premeditated purpose distinctly formed in the mind, or falls within the classes specifically declared in the statute to constitute murder in the first degree. Wharton, *supra*, Sections 377–388. In Section 388 Wharton says that where there is a specific intent, not

STATE v. THOMAS.

to kill but to do great bodily harm, it is not murder in the first but in the second degree, and killing by one insensible from drink, or in the attempt to produce abortion, are mentioned as illustrations. *Ibid.*, Sections 389 and 390.

The physician who was examined for the State testified that her death was not caused by drowning but ensued instantly when her neck was in some way broken. He further testified that the lungs were collapsed and there was no water in the body, from which facts he inferred that she was not drowned. It does not appear that the *post-mortem* examination disclosed evidence of any wounds or bruises upon her person, or that there was testimony tending to show any injury other than the fatal wound in the neck. If there was such evidence it was incumbent on the State or the judge to send it up, since the charge was excepted to on the ground that the whole of the testimony did not tend to show that the prisoner was guilty of murder in the first degree. The witnesses were a half mile away across the water, and while they testified that they heard cries and the noise of blows—the water being a better medium for conveying sound than the air—none of them undertakes to say with accuracy what instrument, if any, other than his hands, the prisoner used to cause death. True, one of them saw her go overboard in the struggle with the prisoner and another heard a sound like striking with a fishing pole, but he did not pretend to state that he saw any such instrument used, or, if used, it did not appear what were its dimensions so that the court could pass upon the question whether it was a deadly weapon. There is no evidence, therefore, that a deadly weapon was used at all. For aught that appears in the evidence it may be true that the prisoner struck the blows—the sound of which was heard—with his fists and knocked her down upon the end or side of the boat so as to break her neck. True, there

STATE *v.* THOMAS.

was evidence tending to show that he continued to beat her for several minutes. There was testimony also that the two were engaged in an argument before the killing, and amongst people in their humble walk in life argument is sometimes used in the sense of quarrel or dispute. Counsel might well have insisted that the jury ought to be allowed to say whether they inferred from the testimony that the prisoner's anger was suddenly aroused by a dispute. While the common-law, in the advance of civilization, has ceased to protect husbands who administer moderate chastisement to their wives, we cannot divest ourselves of that knowledge of human nature and of the customs amongst certain classes of people who sometimes still insist upon asserting the common-law right of correction as they did in the time of Blackstone. It is not inconsistent with some phases, if with any aspect of the evidence, to infer that the unfortunate and (to persons of more refined tastes and higher culture) apparently brutal killing, was done not in the furtherance of any fixed purpose but under the influence of anger engendered by a dispute. The vague threat made while administering the correction is one that would, if it can be relied upon to prove anything, show that many a mother, who in fact harbored no such design, intended to kill her child had she not been diverted from her purpose. It is a matter of common observation that such coarse expres ions are often used at every stage in the administration of what is deemed wholesome correction by ignorant parents. We are not prepared to hold that his saying, when he first came, that " he would knock her in the head," or later, when she was crying, that he would " take something and kill her" if she did not hush, were such evidence of a specific intent to take life, when in the subsequent killing no deadly weapon is shown to have been used, nor does it appear that there was evidence that she

had received any wound that must have been inflicted by any such instrument. There must-be evidence, said the Supreme Court of Pennsylvania, whose construction of the statute we have heretofore followed, (*State* v. *Gadberry*, 117 N. C. 811,) that at the time defendant did the act he thought of his purpose to kill the deceased and had time to think he would execute it. *Com.* v. *D*——, 58 Pa. St., 9. In a Delaware case, (*State* v. *Hamilton*, Hous. Cr. Cases, 101,) where the guilt of the defendant depended upon what constituted premeditation and deliberation, the evidence was that the defendant and the only witness were in a room drinking when the defendant, after striking his wife and sending her into the next room, passed into the latter room several times and struck her on the head with his fist, and that she died several days after from the effects of the blows, The Court held that the jury were properly instructed to convict of murder in the second degree if they found that she died of the repeated blows. So that, in any aspect of the evidence, there was error, to take the view most favorable of the charge, in omitting to explain to the jury the application of the testimony to the theory of murder in the second degree, when the prisoner's counsel was maintaining that the prisoner ought to be convicted of no higher crime. For this error there must be a *venire de novo*.

New Trial.

CLARK, J., (dissenting): The prisoner prayed the court to charge the jury that, "if they believed the evidence to be true, it would not justify a verdict of murder in the first degree." This the court refused to do, and, such refusal being excepted to, raises the only exception in the record. It does not appear that the entire charge was sent up, and it is to be presumed, under the former rulings of this Court, that only so much of the charge was sent up as was neces-

sary to point that exception. The charge as sent up bears out this view, as it shows that the judge submitted the case to the jury in the three aspects of murder in the first and second degree and manslaughter—there being no evidence of self-defense—and he sends up that part of the charge as to what constitutes murder in the first degree in full, (it not being necessary to send up the full charge as to murder in the second degree or manslaughter). The charge as to murder in the first degree is not excepted to, and indeed presents no just ground for exception.

The only exception being that the judge should not have submitted the aspect of murder in the first degree to the jury, if there was any evidence on that aspect of the case sufficient to be presented to the jury, when taken most strongly against the prisoner, the judgment below should be sustained.

The evidence was that the prisoner and his wife were in a boat; that she was screaming and he was beating her with something which sounded like beating with a fishing pole; that he was heard to say to her, "If you don't hush I will take something and kill you." Two other witnesses heard the prisoner say he " would knock her in the head." "Directly after that, a heavy lick was heard, then two more heavy licks, then the prisoner stooped, picked his wife up and threw her overboard, then looked around a minute or so, unloosed his boat and came down where" the witnesses were. He said to them that his wife had fallen overboard. When asked if he had killed her he said, " No, he had not put his hands on her and denied having beaten her." Another witness testified that when he first passed the prisoner and his wife, apparently before he commenced beating her, the prisoner said he would knock her in the head. The *post-mortem* examination showed that the wife's neck was broken, and that her death had instantaneously

resulted therefrom. It would seem that surely this was evidence sufficient to go to the jury on the charge of murder in the first degree. The man declares he will knock his wife in the head; he then begins beating her with a fishing pole; he threatens if she does not hush he will kill her, and that he will knock her in the head; then three heavy blows are heard, possibly with the paddle; at any rate the woman's neck is broken; the husband throws her body overboard, denies having done so, and even having beaten her, and when the body is found it is shown that the violence used on the woman was sufficient to break her neck. Here there are repeated threats to kill, a killing with some heavy and deadly instrument, and a subsequent concealment. Surely this was evidence sufficient to go to the jury of murder in the first degree. . And the sole matter complained of by the appellant is that the judge left that aspect of the case to the jury.

It may be that the evidence as a whole would be sufficient with some persons to mitigate the aspect of the crime to a lesser offence. It may be urged that it was a palliation if the prisoner killed his wife because she was arguing with him. If this could be true, still, whether that was the cause of the killing was a matter of fact for the jury. It may be also that the threats used by the prisoner, and his brutal conduct in a person of his condition, did not mean as much as such words and conduct by others. But the jury, not the court, are to pass upon that. It is the province of the jury alone to draw such inference of fact. There is no technical construction to be placed upon such words or conduct, if used by people in a certain condition of life, which makes their meaning a matter of law to be determined by the court below, and therefore subject to be reviewed here, for we cannot review or weigh the evidence. Our province is simply to

correct errors of law. There being threats to kill, no provocation shown, a cruel beating, then heavy blows, a killing by violence sufficient to break the victim's neck, a concealment and denial of the crime, and all this by a man upon his wife, presumably his inferior in strength, whether all these amounted to murder in the first degree, in the second degree, or manslaughter, was eminently a matter for the jury to determine. To have refused to submit the phase of murder in the first degree would have been a grave invasion of the province of the jury. The jury have said, by a unanimous verdict, that there was no reasonable doubt, upon the evidence, of the prisoner having been guilty of the crime of murder in the first degree. The presiding judge, who also heard the evidence as well as the jury, and who, like the jury, had the benefit of the bearing of the witnesses, and hence a far better opportunity to form a correct idea of the truth of the transaction than this Court, reading the testimony on paper, possibly could have, refused to set the verdict aside. We cannot, without essaying to weigh the evidence, declare that the verdict upon the evidence was wrong, or that the judge erred in his discretion in refusing to set the verdict aside. Our province is limited by the record to the consideration of the single question whether there was any evidence of murder in the first degree to go to the jury, and there our duty and our legitimate power end. A man who brutally kills his wife is not such a favorite of the law that we should presume, contrary to all precedent, that error was committed by the court below in a matter not clearly appearing on the record and not complained of by the prisoner or his counsel by any exception.

MONTGOMERY, J.: I concur in the dissenting opi ion.