This is an indictment for murder. The prisoner, a negro boy, was found guilty of the murder in the first degree of R. L. Bain, a deputy sheriff, and was sentenced to death, and appealed.
The record shows evidence tending to establish the following facts:
Pomona Station is about 3 miles west of Greensboro, and Pomona Cotton Mill is about one-half mile west of Pomona Station, both being on railroad and public road. Terra Cotta is about a quarter of a mile northwest of Pomona Mill. A street-car line runs out west from Greensboro to a little car shed on a cross-road running north from Pomona Mill. This shed is located at end of car line in open field, several hundred yards north of the Pomona Mill, and about one-half mile east of Terra Cotta. From it the cross-road runs south across the public road and railroad to Pomona Mill, and a path runs west down the bottom to Terra Cotta.
On Saturday afternoon, 2 August, 1913, a negro boy, Ernest Madkins, with a bunch of bananas, was going out from Greensboro to Terra Cotta on a street car, on which were several of the Pomona Mill boys, State's witnesses. In course of trip Madkins dropped a banana, and one of the mill boys grabbed it. Madkins said: "Mister, please give me my banana." The mill boy refused, and said he was going to keep it. Later on the trip the negro again asked for the banana, with the same result. On getting off the car at end of line, Madkins saw prisoner standing there with a cane and told him of the banana incident. Thereupon the negroes began to demand the banana, and still the boys refused to give it up. Then the white boys and negroes began throwing some (324) rocks, and during this the deceased came running down the hill across the field from Pomona Mill, calling "Halt!" The negroes started to run down the bottom toward Terra Cotta. The deceased then shot. Running on, he caught Madkins, but prisoner ran on off. Deceased and the mill boys, who had joined with him, took Madkins on back to Company's Store, across railroad at mill. Nothing was known of prisoner until half an hour or more later, when he and another negro were seen passing down the public road from Terra Cotta toward Pomona. In the meantime the prisoner had procured a gun and had bought some shells, saying he was going to shoot birds. When seen, they had passed the cross-road that turns off to the mill and store where deceased *Page 291 
and mill boys were. The negroes, prisoner having a shotgun, went on down the road several hundred yards, met some other negroes in the road, talked a while, and then turned and started back up the road toward Terra Cotta. Meanwhile deceased had deputized men, giving Wright a pistol and keeping his own, and started out to meet prisoner and "arrest him." The men, led by deceased and Wright, and without a warrant, went out cross-road north across railroad to public road, and turning down east, went down it till they met the prisoner coming up road and going towards his home at Terra Cotta. Deceased walked up within 3 or 4 feet of the prisoner, and asked him if he was at car line in the riot. He denied it, refused to be arrested, asked who the officer was, drew his gun on deceased, stepped back from crowd, threatening to shoot, and refusing to be arrested. He then took down his gun and walked straight up the road toward home without looking back. Deceased and those with him stood still in the road till prisoner had gone from 30 to 40 yards away, and then deceased suggested arresting him for drawing his gun. The deceased and his party then advanced behind prisoner for some distance, gaining on him. Deceased covered him with his pistol and called "Halt!" from three to six times, all the time walking on behind prisoner, who did not even look around. Just as prisoner was nearly past the cross-road leading into mill, and was going on toward home and away from the mill and the crowd, deceased said: "I have told you my last time." Deceased had prisoner covered when he said this. Prisoner then looked back for first time; then, as he (325) raised his gun, he snapped it; the deceased shot at prisoner; prisoner shot once, killing deceased; turned and ran as hard as he could, with crowd chasing, firing ten to twenty-five or thirty shots after him.
Holly A. McNairy, introduced by the State, testified as follows: "I am a merchant at Terra Cotta and know the prisoner. I remember the date the deceased was killed, and I saw the prisoner on that afternoon before the deceased was killed, probably between one-half and three-quarters of an hour before. It was about 6 o'clock, something near 6 o'clock, when he came in the store and wanted 10 cents worth of shells. I sold them to him; he looked like he had been running; was hot. I asked him if he was going to shoot anybody, and he said no, he was going to shoot some birds. He had a gun with him, a double-barrel gun, I think. I didn't see him after he went out of the store."
N.J. Wright testified for the State as follows: "I live at Pomona Mills and remember the occasion on which the deceased was shot. I was with him at the time, but was not on the street car that afternoon. I was on my way to the mill and walked up to where the deceased and several others were standing at the Company Store. The deceased had *Page 292 
a negro under arrest and asked me to go with him up the road where those negroes were. I told him I would go, so I walked up the road to meet them. The prisoner is the only one I know. When the prisoner had met the other darkies down the road, they stopped and talked a little bit, and the prisoner and two others came down the road. The prisoner was carrying his gun. When we met the negroes, the deceased said: `Were you down at the depot, at the car shed in that riot?' The prisoner said: `No, by God, I wasn't.' He then asked what we were going to do about it. After that he stepped back and cocked his gun and asked which one of us was the God damned officer that was shooting at the car shed. The deceased then said: `I am the officer; here is my badge.' The prisoner then drew his gun and said: `You are the damned man I want.' He didn't put his gun to his shoulder. It was pointed toward the deceased. The deceased said he didn't want any trouble at all, but just wanted to get the straight of it; wanted to quiet it (326) down. The prisoner then asked what we were going to do about it, turned around, let his gun down, didn't let the hammers down, and started on up the road. Repeated several times that there was no God damned son of a bitch in the county who could arrest him; that he would kill any officer that undertook it. He went on up the road, one darkey with him, something like 50 or 75 yards. As he was going up the road, the deceased said to me: `Let's arrest that negro for drawing that gun.' The deceased then told me to come with him, and we walked on up the road, gaining on the prisoner. The deceased hallooed `Halt!' three or four times. Then the deceased said: `I have told you my last time to halt.' The prisoner turned around then with his gun and said: `I can shoot as damned hard as you can,' and snapped his gun at the deceased. The deceased fired at him, and then the prisoner shot and killed the deceased. The prisoner then turned and started to run."
There was other evidence to the same effect, introduced by the State.
The prisoner introduced no evidence.
The only exceptions relied on are to the charge of his Honor and to the refusal to give certain special instructions.
We have examined the charge of his Honor with great care, and find no error in the charge given, or in the refusal of the special instructions, nor do we concur in the position that the evidence and contentions of the State were unduly emphasized. *Page 293 
The criticism of the charge that "The burden would be upon the defendant to show facts and circumstances in mitigation," and, "If the defendant, as heretofore explained by the court, has offered evidence which mitigates the offense," is supported by S. v. Castle, 133 N.C. 769, upon the ground that such a charge excludes the idea that the prisoner may rely on evidence offered by the State in mitigation; but the court did not let the matter rest here, and, on the contrary, distinctly charged the jury that in mitigating or excusing the (327) offense the prisoner "has a right to rely upon evidence offered by the State." His Honor charged the jury that they must be satisfied beyond a reasonable doubt that the killing was with premeditation and deliberation before they could convict of murder in the first degree.
He then further charged that, "Deliberation means to think about, to revolve over in one's mind; and if a person thinks about the performance of an act and determines in his mind to do that act, he had deliberated upon the act, gentlemen. Premeditation means to think beforehand, think over a matter beforehand; and where a person forms a purpose to kill another, and weighs this purpose in his mind long enough to form a fixed design to kill at a subsequent time, no matter how soon or how late, and pursuant to said fixed design kills said person, this would be a killing with premeditation and deliberation, and would be murder in the first degree. And the court charges you if you should find beyond a reasonable doubt, gentlemen, that prior to the time he killed the deceased he formed the fixed purpose in his mind to kill him, and that pursuant to that purpose he did kill the deceased because of the purpose in his mind, and not because of any legal provocation that was given by the deceased, then the court charges you that the prisoner would be guilty of murder in the first degree, and it would be your duty to so find."
The prisoner excepts to the latter part of the charge, contending that "fixed design" is not the equivalent of premeditation and deliberation, and that the prisoner could be convicted, under the instruction, of murder in the first degree, without premeditation and deliberation.
His Honor did not charge that the prisoner could be convicted of murder in the first degree because of the existence of a fixed design to kill, although there is authority justifying the charge (S. v. Dowden,118 N.C. 1145; S. v. Barrett, 142 N.C. 565; S. v. Jones, 145 N.C. 466); but he was careful to tell the jury that they must find premeditation and deliberation; he explained accurately the meaning of these terms, and then said the killing must have been pursuant to the fixed purpose, and not on account of any legal provocation. *Page 294 
(328) The charge, considered as a whole, excludes the idea that the prisoner could be convicted because of the fixed design, although formed under circumstances that would mitigate or excuse.
In the Dowden case the Court says: "The word `premeditate' means to think beforehand — as where a man thinks about the commission of an act and concludes or determines in his mind to commit the act; he has thus premeditated the commission of the act. The law does not lay down any rule as to the time which must elapse between the moment when a person premeditates or comes to the determination in his own mind to kill another person, and the moment when he does the killing, as a test. It is not a question of time. It is merely a question of whether the accused formed in his own mind the determination to kill the deceased, and then at some subsequent period, either immediate or remote, does carry his previously formed determination into effect by killing the deceased." And in theBarrett case: "The rule laid down in this State is, that where the prisoner weighs the purpose to kill long enough to form a fixed design, and then puts it into execution, it is murder in the first degree."
In the section from Wharton on Homicide, p. 161, relied on by the prisoner, while it is said that the formed design is not the equivalent of premeditation and deliberation, since the design may have been formed under circumstances of justification or excuse, the author also says: "That the homicide was determined upon beforehand, and purposely committed after reflection, with malice, however, is the equivalent of the willfulness, deliberation, malice, and premeditation required by the statute," which is in accord with the charge given.
The jurors were fully instructed as to the rights and duties of the prisoner, and of the deceased as an officer, at the time of the killing. They were told that the deceased had no right to arrest on account of the affray at the car shed, because that was a past transaction, and he had no warrant; that if he was attempting to arrest for that affray, the prisoner had the right "to use whatever reasonable force was necessary to prevent the arrest," and if reasonably necessary for that purpose to present his gun, he had the right to do so, and he would not be (329) guilty of an assault in so doing; that if not guilty of an assault, the deceased had no right to point a pistol at him, and that if the deceased was killed under these circumstances when necessary to prevent an arrest, the prisoner would be excused, and if not necessary, that his crime would be reduced to manslaughter.
He further charged the jury: "If you find under these circumstances as explained to you, that Mr. Bain had not attempted to arrest him there, and that the defendant drew his gun upon him, and that Mr. Bain *Page 295 
was an acting officer, and that he declared his purpose then to arrest him for the assault upon him, then the court charges you that he had a right to arrest him, and had the right to do it even for an assault, and even though the assault may have been committed upon Mr. Bain; that would be a breach of the peace, a crime, and though it may have personally affected Mr. Bain, it affected the public at large as well, and he would have a right, for a breach of the peace of that kind, to arrest him. And if you further find from the evidence that he made this announcement in the presence of the defendant, near enough for him, the defendant, to hear, that he was going to arrest him for that (referring to the drawing of the gun), and then that he ordered him to halt, then the court charges you that it was the duty of the defendant to stop, not to go on. If he ordered him to halt again, it was still his duty to stop and not to go on, and if you further find from the evidence that he ordered him to halt a third or fourth time, and told him this was the last time he was going to order him to halt, and he didn't have his pistol drawn on him at all — simply had it in his hand, or maybe not drawn out from his pocket — then the court instructs you that if the prisoner turned and shot him under those circumstances, that he would be at least guilty of murder in the second degree."
The last two paragraphs are excepted to principally upon the grounds —
(1) That the deceased had no right to arrest for an assault upon himself.
(2) That if he had the right to arrest, he had no right to use a pistol, because the offense was a misdemeanor.
(3) That if he had the right to arrest, he could only do so (330) immediately upon the assault being committed, and not after he had permitted the prisoner to go 50 or 75 yards.
The assault upon the deceased was not an offense against the individual, but one against the public, and for this reason the authorities generally support the position that it is the right of a peace officer to arrest, without warrant, one who assaults him (3 Cyc., 880; Montgomery v. Sutton,67 Iowa 497; Leddy v. Crossman, 108 Mass. 237), and the officer did not lose the right in this case because the prisoner had walked off, according to the evidence of one witness, 30 or 40 feet, and to that of another, 50 or 75 yards.
The second position presents greater difficulty, because it is generally held that an officer cannot kill to affect an arrest or to prevent the escape of one charged with a misdemeanor. S. v. Phillips, 67 L.R.A., 200, note, where the authorities are collected. It was well said in Thomas v.Kinkead, 29 A.S.R., 73, that as the lawmaking power itself *Page 296 
could not inflict the death penalty as a punishment for a misdemeanor, "it would ill become the `majesty' of the law to sacrifice a human life to avoid a failure of justice in the case of a petty offender who is often brought into court without arrest and dismissed with a nominal fine."
It must be noted, however, that the prisoner was armed with a gun, which he had presented a few minutes before, and that he had declared his purpose to kill any one who tried to arrest him; and further, that the deceased did not shoot in the first instance. He had the pistol presented, it is true, but if he had the right to arrest, this was not only necessary to enable him to effect the arrest, but also to prevent the use of the gun.
In S. v. Garrett, 60 N.C. 149, which was an indictment against an officer for killing one charged with a misdemeanor, whom he was trying to arrest, the Court says: "His Honor ought to have instructed the jury that, as the deceased had put himself in resistance to the officer and his guard, they were not only authorized, but were bound, to use such a degree of force as was necessary in order to execute the warrants, and were entitled to a verdict of acquittal on the ground that the homicide was justifiable, if no unnecessary violence had been used, unless (331) from the fact that the prisoner had started to cross the fence the jury should be satisfied that he had abandoned his deadly purpose of resisting to the death the execution of the law, and was attempting to make his escape by moving off; in which event there was no longer any necessity for shooting; and the officer, or some portion of his men, should have run after him and captured him in that way."
The case of S. v. Horner, 139 N.C. 607, is in many respects like the one before us, and S. v. Durham, 141 N.C. 744, is almost directly in point.
In the Durham case the prisoner was arrested upon a warrant charging a misdemeanor, and carried to the office of a justice. He slipped out and began running. He looked back and saw the officer pursuing him, about 20 yards distant, with a pistol in his hand, which was pointed at him. He then drew his pistol, but did not present it. The officer then shot at the prisoner, and the prisoner returned the fire. The officer shot a second time, grazing the arm of the prisoner, when he turned and shot and killed the officer. A conviction of murder in the second degree was sustained, there being no evidence of premeditation and deliberation, and the Court said: "The officer is not excused if he, with undue violence, menaces the life of the defendant when he attempts to arrest a person for a misdemeanor. The officer may be convicted and punished. But his crime will not excuse or condone the crime of the defendant in making open resistance to the process of the State. We are aware that *Page 297 
in some jurisdictions it is held otherwise, and that while an officer, in attempting to arrest for a misdemeanor, dangerously menaces the life of the accused, the latter may defend himself to the extent of taking the officer's life, and the plea of self-defense is open to him. But in this State we have a statute (Laws 1889, ch. 51) which enacts that `any person who willfully and unlawfully resists, delays, or obstructs a public officer in discharging or attempting to discharge a duty of his office shall be guilty of a misdemeanor.' At the time he killed the deceased the defendant was engaged in an unlawful act, not only malum in se
(being in armed resistance to the process of the State), but an act directly connected with, and which finally resulted in, the death of the officer; for it is plain that had the defendant himself not (332) resisted the law, but submitted to arrest, there would have been no homicide by any one."
We are, therefore, of opinion there is no error in the instructions complained of.
We do not agree with counsel for the prisoner that his Honor expressed an opinion upon the fact when he said, "And if he killed him with deliberation and premeditation, as heretofore explained to you by the court, and this is shown beyond a reasonable doubt from the evidence, he would be guilty of murder in the first degree."
In view of the whole charge, the jury could not have understood the judge as saying that premeditation and deliberation had been shown, but that the State must show it beyond a reasonable doubt.
The evidence of premeditation and deliberation was sufficient to be submitted to the jury. S. v. McCormick, 116 N.C. 1033; S. v. Daniels,164 N.C. 469.
There was evidence that the deceased had tried to arrest the prisoner for the affray at the car shed; that he fled and procured a gun and shells; that immediately before the killing he committed an assault upon the officer, cursed and threatened to kill him.
We have discussed the exceptions chiefly relied on and have considered all that appears in the record, and while there are views of the evidence offered by the State which would have justified a conviction of murder in the second degree or manslaughter, we have no power to revise the findings of the jury, and are constrained to affirm the judgment.
The deceased would not have been killed, nor would the prisoner be now under sentence of death, if the witness for the State had given up the banana which he had wrongfully taken from the boy Madkins, when politely requested to do so; nor if the deceased had not deputized persons to aid him in arresting the prisoner and followed him, when he had no right to make the arrest for the first affray, having no warrant.
No error. *Page 298 
 Cited: S. v. Benson, 183 N.C. 798; S. v. Robinson, 188 N.C. 785; S. v.Steele, 190 N.C. 511; S. v. Miller, 197 N.C. 447; S. v. Evans, 198 N.C. 84;S. v. Bittings, 206 N.C. 803; S. v. Taylor, 213 N.C. 523; S. v. Payne,213 N.C. 727, 728, 729; S. v. Bowser, 214 N.C. 253; S. v. Hawkins, 214 N.C. 334; S. v. French, 225 N.C. 283, 284; S. v. Wise, 225 N.C. 748.
(333)