## STATE v. HENRY FRENCH.

(Filed 6 June, 1945.)

**1. Homicide § 25—**

> In a prosecution for murder, where the State's evidence tended to show that deceased, her husband and others, in the husband's automobile, were driving out of an alley into the highway, the defendant in his own car following, that the first car ran into the highway and stopped and defendant, following and in trying to get around the first car, hit a telephone pole, when the first car drove off and defendant backed from the post and drove home, that shortly thereafter defendant came up to the first car demanding damages and cursing and when deceased and other occupants of the car walked off, defendant followed, still arguing about his damages and cursing and threatening the whole party, none of whom apparently had any weapons, and finally defendant, telling deceased's party to wait until he got back, ran off to his house near-by and coming back in a few minutes with a rifle, stuck the barrel into the car and fired four or five times and when deceased got out of the car, defendant shot her in the back, as she looked away from him, and she fell and defendant ran, deceased being dead a few minutes thereafter, there was ample evidence for the jury and motion for judgment as of nonsuit properly denied.

**2. Same—**

> Testimony, in a prosecution for murder, of a mortician, who examined deceased's body shortly after her death, that deceased's veinous system

had broken down, is insufficient to prevent the case being submitted to the jury, where the State's evidence tended to show that deceased was alive and active one moment, and immediately after repeated shots from a rifle in the hands of defendant, was found dead with a rifle wound in her chest.

**3. Criminal Law § 53a: Homicide § 27a—**

. A charge by the court to the jury must be construed contextually.

**4. Homicide § 4c—**

Deliberation means to think about, to revolve in one's mind; and if a person thinks about the performance of an act and determines in his mind to do that act, he has deliberated upon that act. Premeditation means to think beforehand; and where a person forms a purpose to kill another and weighs this purpose in his mind long enough to form a fixed design to kill at. a subsequent time, no matter how soon or how late, and pursuant to said fixed design, kills said person, this would be a killing with premeditation and deliberation, and would be murder in the first degree.

STACY, C. J., dissenting.

WINBORNE, J., concurs in dissent.

APPEAL by defendant from *Bobbitt, J.,* at October Term, 1944, of MONTGOMERY.

The defendant was tried at the October Term, 1944, of the Montgomery Superior Court, upon an indictment charging him with murder of Duck LeGrand.

The evidence of the State tended substantially to show that James Richardson, driving Shang LeGrand's car, in which were Shang and his wife, Duck LeGrand, the deceased, and other persons, was going out of an alleyway towards the highway. French was driving his car along behind them. As Richardson came out of the alleyway and turned along the highway, French came out, also, and in trying to go around the car, hit a telephone pole. There was no collision between the cars. When the French car struck the telephone post, the LeGrand car stopped, then pulled off and went on to Wadeville. French backed away from the post and carried his car towards home. About 25 minutes later, a State's witness met defendant going up the road, and defendant asked him "where that damn Shang LeGrand was." Witness said that he did not know, and French replied that somebody was going to pay for his G—— damn car. About that time Shang LeGrand's car passed, and defendant went on to where Shang's car was parked on the right-hand side of the road. Later witness found French at the LeGrand car arguing about his own car and talking to James Richardson. Duck LeGrand and her husband were there also. French told Richardson that he wanted pay for the "damn damages." Richardson told him to wait until tomorrow

and he would talk about it. Duck and Shang and the rest of them walked down the road to "Craven's house." Another person went up and got LeGrand's car and drove it, French standing on the side of it. The car was driven about 40 yards from where they had been talking. French kept arguing about damage to the car, and James kept telling him he would see him tomorrow. French replied, "G—— damn it, wait till I come back, I will kill all you s. o. b.'s." Duck LeGrand, Shang LeGrand, James Richardson and Margaret Ingram were present. Witness had not seen any previous fight, nor had he seen any weapons of any kind in the hands of LeGrand and his wife, or any of that party.

The defendant then ran down through a cornfield about six or seven hundred yards to his house; and some ten minutes later came running back with a rifle and ran around the side of the car where the driver was. He came by the side of the car where Shang LeGrand was, stuck the barrel of the rifle in the car and shot four or five times into the car. Duck LeGrand and Shang LeGrand were sitting on the front seat of the car as the defendant approached on the driver's side. Witness did not hear either of the LeGrands or French say anything. French fired five or six times and Duck started to get out of the car. She got out on the running board, and defendant fired again, and she fell. He was standing near the front of the car when he shot Duck Legrand. Her face was turned away from defendant, her back to him, and when she fell, defendant turned around and ran.

E. T. Reynolds, a mortician of fifteen years' experience, and licensed by the State, testified that on the night of September 2nd he saw the bodies of Duck LeGrand and Shang LeGrand, both in front of the bank building. Duck LeGrand was in the back of the car, down in the foot. Witness prepared her body for burial, finding a bullet wound in her back, about an inch to the left of her spinal column and down below the shoulder blade. The veinous system was punctured somewhere in the thorax or the chest. The bullet wound in the back was about the size of a .22-caliber rifle bullet.

Another witness for the State testified that he pulled the Shang LeGrand car out from the "piccolo" (restaurant) out in front of Craven's, and drove it a distance. French was standing on the running board on the driver's side. There was no one in the car at that time. After the car was pulled in front of Craven and Beatrice Turner's house, the defendant began to curse Duck LeGrand and Margaret, her daughter, in the presence of Shang, Arthur Hill and Henry Ingram, Duck LeGrand's boy, a lad about 15 or 16 years old. Defendant called Duck a s. o. b., and after he called her that, he left and said he was going home and get his gun and come back and kill all the s. o. b.'s. He broke and ran through a cornfield. Witness was not present when he came back.

STATE *v.* FRENCH.

Arthur Hill testified that he was with Shang LeGrand and Duck, the deceased woman, and James Richardson. Duck and Shang drove in front of Miss Flora's, on the right-hand side, and stopped, and the party was there a few minutes when defendant walked up and began talking to Richardson about the damage. Richardson asked him to wait, until tomorrow and defendant said, "I am going to have some damn damage tonight. He was talking to Richardson, Duck and Shang LeGrand. French was cursing Duck LeGrand and Shang LeGrand, and then John D. McCall came, got the car and drove it on down in front of Craven's, with French hanging on the side of the car. Duck and Shang went on down behind the car after it had been driven on. Then the argument started again, with defendant cursing them and repeating that he intended to have some damn damages. He then ran up the road, telling Shang and his wife to be there when he got back, he was going to kill every s. o. b. that was there. He came back in about 20 minutes, had his rifle up when witness broke and ran. Defendant ran around on the driver's side and poked the rifle into the car, and witness heard four or five shots. Duck and Shang were in the car at the time. Later, he saw Duck lying on the back seat, dead.

Henry Ingram testified that Duck LeGrand was his mother and Shang LeGrand was his stepfather. Witness was standing in his grandmother's yard when defendant came up to the automobile. Witness was about 25 or 30 yards from the automobile in which his mother and stepfather were sitting. The defendant was standing there shooting into the LeGrand car in which were his mother and stepfather when the witness first saw him. He saw him fire four or five shots into the car.

Witness started towards the car, and defendant turned around and shot him in the leg. The defendant was standing beside the car when he fired on the witness, and witness heard him fire again after he went back into his grandmother's house.

Witness returned to the car, found his mother lying on her face in the back of the car, picked her up, put her in an automobile and carried her to Dr. Harris' office. She was dead when witness picked her up. Witness did not have any weapon, nor did he find any weapon about the body of his mother when he picked her up.

Ivey Hall, Chief of Police of Troy, testified that he brought the defendant to the sheriff's office or jail. He asked French why he shot those people, and the reply was that they had been "picking at him and he got tired of it, and said he would show them who to mess with."

At the close of the State's evidence, the defendant moved to dismiss as of nonsuit and for a directed verdict of not guilty as to the count or allegation of murder in the first degree. The motions were overruled, and the defendant excepted.

The defendant testified that he was 34 or 35 years old and lived in Troy; that he had known Duck LeGrand and Shang Legrand all his days.

Defendant testified that they were at "Miss Flora Kelly's 'piccolo,'" a short distance at the rear of the courthouse. He saw Duck and Shang LeGrand come out from the "piccolo" in a car; that they started up ahead of witness "and made a bad drive in front of me," in consequence of which defendant bore to the left and hit a "telegram" post and cut it down. Defendant testified that he carried his car to the house and returned to the "piccolo," saw Shang LeGrand when he left the highway and turned to go into the "piccolo walk." They were up where the post had been cut down and were talking about it, and Duck LeGrand and her two daughters and her son, Arthur Hill and Henry Ingram and McCall's boy came out from the "piccolo." Duck said, "Shang, come on and get in the car, this ain't no place to settle a wreck; get in the car and we will go down here and settle it." One of the women asked him to stand on the fender. There were seven in the car, and defendant standing on the fender. They drove down close to where the shooting took place and stopped. There they tried to throw witness off, saying that he did not have any G—— damn business on there. Witness testified they all got out of the car and "began to surround me with weapons in hand, and I begged and pleaded to them not to jump on me with the weapons. Duck LeGrand had a pocket knife; her two daughters, Margaret and Judy, had a pocket knife; Shang had a pocket knife, and her son, Henry, had a stick; and Arthur Hill had his hand stuck down in his pocket; I don't know what he had. I began to back up and beg and plead to them to not jump on me. Arthur Hill stepped around sort of behind me in this direction. He said, 'G—— damn it, don't back up this way; stay in there; don't come up this way.' Henry Ingram came through the crowd and said, 'Let me get over there with that stick, I will fix him, G—— damn him,' and so I ran."

"When I ran toward the house some of them ran after me. I didn't look back to see which ones it was after me; and I ran on and got tangled up in some wire. Some of them, I don't know who it was, threw a rock or two at me, and I got out of the wire and ran to the house. They absolutely ran after me when I went running towards my house. I was followed pretty close to the house."

Defendant further testified, in substance, that they had him scared, and he was begging them not to jump on him with their weapons; that when he got to the house he picked up a rifle and went out into the yard and found two people. He went on and saw Shang LeGrand and Arthur Hill going back in the direction of the "piccolo." Defendant then went back down to the car and walked up to it with his rifle; "they didn't

know I had a rifle." He told Shang he wanted to speak to him and see what' he had done to them and why they wanted to treat him like they had. Shang cursed him and told him he was going to kill him, had his knife in his hand. Defendant testifies he backed up and pointed his gun and told him to stop, and he didn't stop; "he advanced towards me, and I pointed up my gun and I shot at him." He turned about and went to his door and said, "Dulcie, hand me that thing, this s. o. b. has got a gun; I am going to kill him." He went to the driver's side and Duck, or Dulcie, was standing on the right-hand side of the car with the door open. That was the opposite side from the one Shang went to. He opened the door and reached over and told her, "hurry up." Defendant then shot through the windshield, didn't know whether Shang had a gun in there or anything; said they made him think they wanted to kill him, so he shot through the windshield,.then stepped around to the side of the car and shot through the car. Defendant testified he didn't try to shoot Duck LeGrand, and that he had no intention to kill Duck or Shang LeGrand.

Defendant testified that when he got his rifle from the house he went straight back to where the LeGrands were, "right behind the automobile and didn't stop."

After some evidence in rebuttal, the State rested and defendant renewed his motion for judgment as of nonsuit and for a directed verdict of not guilty on the count of murder in the first degree. The motions were overruled, and defendant excepted.

*Inter alia,* the judge charged the jury as follows:

"Before you can return a verdict of guilty of murder in the first degree, the burden is upon the State to satisfy you further from the evidence beyond a reasonable doubt that the defendant killed Duck LeGrand not only unlawfully and with malice, but with premeditation and deliberation, and the Court charges you that if the State has satisfied you from the evidence beyond a reasonable doubt that the defendant unlawfully killed Duck LeGrand with malice, and has further satisfied you from the evidence beyond a reasonable doubt that prior to the time the defendant inflicted upon Duck LeGrand the fatal wound, the defendant had formed a fixed purpose in his mind to kill her, and that, pursuant to that purpose he did kill Duck LeGrand because of the purpose in his mind, and not because of any legal provocation given him, then the Court charges you that if the State has so satisfied you from the evidence beyond a reasonable doubt, the defendant would be guilty of murder in the first degree, and it would be your duty to so find." (Defendant's Exception No. 6.)

"Now, if the State has satisfied you from the evidence beyond a reasonable doubt that the defendant unlawfully killed Duck LeGrand

with malice and with premeditation and deliberation, it would be your duty to return a verdict of guilty of murder in the first degree, and you would return your verdict in these words: 'Guilty of murder in the first degree.'" (Defendant's Exception No. 9.)

The jury returned a verdict of murder in the first degree. Defendant moved to set aside the verdict for errors committed in the trial, and the motion was denied.

To the judgment of death rendered upon the verdict of the jury, the defendant objected and excepted, and appealed to this Court.

*Attorney-General McMullan and Assistant Attorneys-General Rhodes and Moody for the State.*
*Brown & Mauney for defendant, appellant.*

SEAWELL, J. We find no merit in the exceptions based on demurrer to the evidence as not being sufficient to sustain a verdict of guilty of murder in the first degree. The evidence, which, because of these motions, we have summarized at some length, is ample in that respect and needs no special comment.

Appellant's more serious assignments of error relate to the instructions given to the jury.

One of these assignments of error challenges the correctness of the judge's instruction on the necessity of proving guilt beyond reasonable doubt, contending that he assumed there was evidence tending to show that deceased came to her death at the hands of defendant, whereas the evidence, particularly that of the mortician, who testified that deceased's veinous system had been broken down, was deficient on that point. But without this testimony, evidence that deceased was bodily active the moment before, and immediately after repeated shots from a rifle in the hands of defendant was found dead with a wound through her chest, subsequently found to have been inflicted by a rifle bullet, is certainly sufficient to go to the jury as to the cause of death and its infliction by the defendant. Also, later in the charge the court made appropriate reference to the necessity of proving that the wound so inflicted was the cause of death. The charge must be considered contextually. *S. v. Hunt,* 223 N. C., 173, 25 S. E. (2d), 598; *S. v. Utley,* 223 N. C., 39, 25 S. E. (2d), 195; *S. v. Hairston,* 222 N. C., 455, 23 S. E. (2d), 885.

The appellant further contends that the instruction to the jury set out in the statement of the case under Exception No. 9 deprived him of the benefit of his plea (and evidence thereunder), that the killing was done in his necessary and lawful self-defense. In support of this he cites *S. v. McHaffey,* 194 N. C., 28, 138 S. E., 337, in which the instruction given was held to have deprived the defendant of his right of self-defense.

Upon comparison of the cited case with the instruction here given, we are of opinion that the contention is not meritorious.

However, there is a further challenge to the instruction as not having again and immediately defined "deliberation," although that had been adequately and accurately defined in a preceding instruction. Beyond the familiar rule that the charge must be interpreted contextually, we have direct approval of the challenged instruction in *S. v. McClure,* 166 N. C., 321, 327, 81 S. E., 458. The instructions are practically identical, and for convenience in a word by word comparison, we quote from *S. v. McClure, supra:*

"Deliberation means to think about, to revolve over in one's mind; and if a person thinks about the performance of an act and determines in his mind to do that act, he had deliberated upon the act, gentlemen. Premeditation means to think beforehand, think over a matter beforehand; and where a person forms a purpose to kill another, and weighs this purpose in his mind long enough to form a fixed design to kill at a subsequent time, no matter how soon or how late, and pursuant to said fixed design kills said person, this would be a killing with premeditation and deliberation, and would be murder in the first degree. And the court charges you if you should find beyond a reasonable doubt, gentlemen, that prior to the time he killed the deceased he formed the fixed purpose in his mind to kill him, and that pursuant to that purpose he did kill the deceased because of the purpose in his mind, and not because of any legal provocation that was given by the deceased, then the court charges you that the prisoner would be guilty of murder in the first degree, and it would be your duty to so find."

We have carefully considered the exceptions taken to the trial and examined the record for error, and we see no reason that would justify us in interfering with the result of the trial. We find

No error.

STACY, C. J., dissenting: One of the vital issues in the case was whether the defendant slew the deceased in cold blood or in the heat of passion, suddenly aroused by argument over the damage to his automobile. After correctly stating the elements of murder in the first degree to be the unlawful killing of a human being with malice and with premeditation and deliberation, the court then said: "And the court charges you that if the State has satisfied you from the evidence beyond a reasonable doubt that the defendant unlawfully killed Duck LeGrand with malice, and has further satisfied you from the evidence beyond a reasonable doubt that prior to the time the defendant inflicted upon Duck LeGrand the fatal wound, the defendant had formed a fixed purpose in his mind to kill her, and that, pursuant to that purpose he did kill Duck LeGrand

because of the purpose in his mind, and not because of any legal provocation given him, then the Court charges you that if the State has so satisfied you from the evidence beyond a reasonable doubt, the defendant would be guilty of murder in the first degree, and it would be your duty to so find."

This charge as applied to the facts of the instant record fails to draw any distinction between a fixed purpose "deliberately formed" and one engendered from passion suddenly aroused. *S. v. Thomas,* 118 N. C., 1113, 24 S. E., 431; *S. v. Walker,* 173 N. C., 780, 92 S. E., 327. It sufficiently defines premeditation, but makes no reference to deliberation. *S. v. Fuller,* 114 N. C., 885, 19 S. E., 797. "Premeditation" imports prior consideration, "thought of beforehand," while "deliberation" signifies reflection, "in a cool state of the blood." *S. v. Exum,* 138 N. C., 601, 50 S. E., 283; *S. v. Evans,* 198 N. C., 82, 150 S. E., 678. It may not be necessary in every case to refer to the two terms separately, but both ideas are essential to a complete definition of the capital offense. *S. v. Exum, supra; S. v. Spivey,* 132 N. C., 989, 43 S. E., 475. This was so at common law, and our statute dividing murder into degrees denominates any "willful, deliberate and premeditated killing" as murder in the first degree. G. S., 14-17; *S. v. Hawkins,* 214 N. C., 326, 199 S. E., 284.

Had the instruction excluded the idea of a killing from anger presently incited, and conveyed only the thought of a homicide from a fixed determination previously formed after weighing the matter, it would have sufficed without separate definition of premeditation and deliberation. *S. v. Coffey,* 174 N. C., 814, 94 S. E., 416; *S. v. Exum, supra.* But this is hardly its significance. *S. v. Thomas, supra.* An unlawful killing with malice and with premeditation falls short of murder in the first degree. The additional element of deliberation is necessary to make out the capital offense. *S. v. Payne,* 213 N. C., 719, 197 S. E., 573; *S. v. Miller,* 197 N. C., 445, 149 S. E., 590; *S. v. Benson,* 183 N. C., 795, 111 S. E., 869; *S. v. Thomas, supra.* "Any unlawful killing of a human being with malice aforethought is murder; but if nothing further characterizes the offense, it is murder in the second degree—to constitute the higher offense, there must be willfulness, deliberation, premeditation." *People v. Cox,* 76 Cal., 285, quoted with approval in *S. v. Fuller, supra.*

True it is, in other portions of the charge both terms are correctly defined, but here the court was undertaking to sum up the whole matter in a single sentence or instruction, as was attempted in *S. v. McHaffey,* 194 N. C., 28, 138 S. E., 337, which resulted in a new trial.

The case of *S. v. McClure,* 166 N. C., 321, 81 S. E., 458, is cited as a controlling authority. There, after some hesitancy and much contextual interpretation, a similar instruction was upheld as applicable to the

facts of that case. A deputy sheriff had been killed while attempting to make an arrest, following a small "riot" and repeated threats on the part of the prisoner "that there was no G— d— s— o— b— in the county who could arrest him; that he would kill any officer that undertook it." The prisoner offered no testimony. Here, the evidence of a "willful, deliberate and premeditated killing" is not so clear, and the crucial facts are in dispute. The paucity of the instruction seems apparent.

I would remand the case for another hearing.

WINBORNE, J., concurs in dissent.